442 Pa. 45 (1971)
Commonwealth ex rel. Carroll
v.
Tate et al., Appellants.
Supreme Court of Pennsylvania.
Argued November 24, 1970.
February 16, 1971.
*46 Before BELL, C.J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.
Henry T. Reath, with him Duane, Morris & Heckscher, for petitioners.
Levy Anderson, City Solicitor, with him John B. Day, Assistant City Solicitor, Joseph Ominsky, Deputy City Solicitor, and Matthew W. Bullock, Jr., First Deputy City Solicitor, for respondents.
Thomas N. O'Neill, Jr., and Montgomery, McCracken, Walker & Rhoads, for Board of Governors of Philadelphia Bar Association.
Andrew Hourigan, Jr., with him Richard M. Goldberg, and Hourigan, Kluger & Spohrer, for Pennsylvania Bar Ass'n, amicus curiae.
*47 OPINION BY MR. CHIEF JUSTICE BELL, February 16, 1971:
On June 16, 1970, President Judge Vincent A. CARROLL, individually and on behalf of all of the Judges of the Court of Common Pleas of Philadelphia, instituted this suit by a Complaint in Mandamus to compel the Mayor and City Council of Philadelphia to appropriate the additional funds requested by them for the important and necessary administration of the Court of Common Pleas of Philadelphia for the fiscal year commencing July 1, 1970 and ending July 1, 1971.[*]
We shall hereinafter set forth the intricate facts involved in this suit, but, initially, we deem it important to focus on the fundamental questions involved: (1) whether the Judicial Branch of our Government has the inherent power to determine what funds are reasonably necessary for its efficient and effective operation; and (2) if the Judiciary has the power to determine what funds are reasonably necessary, does it then have the power to compel the Executive and Legislative Branches to provide such funds after the requested amount has been reduced in, or wholly or partially eliminated from, the budget proposed by the Executive Branch and approved by the Legislative Branch.
The Court of Common Pleas, pursuant to the Philadelphia Home Rule Charter of April 17, 1951, Section 8-103, on December 3, 1969, submitted to the City's Finance Director (on the necessary forms) its operating budget estimates of the financial needs of the Court of Common Pleas and the Municipal Court.[**] The total *48 amount of requests submitted was $19,706,278. After several meetings between the Finance Director and representatives of the said Court, the sum was reduced to $16,488,263, and, on April 1, 1970, this amount was finally sent to City Council by the Mayor in his proposed annual operating budget message. On May 4, 1970, President Judge CARROLL, Judge D. Donald JAMIESON (now President Judge), and Administrative Judge Frank J. MONTEMURO, together with several members of their administrative staffs, gave extensive testimony before City Council, seeking to document their requests. The Court at this time also requested an increase of $5,230,817 over the amount proposed in the Mayor's aforesaid budget of April 1st. Of this sum of $5,230,817, $2,012,801 had not previously been requested of either the Finance Director or the Mayor prior to the time the Mayor submitted his budget. City Council denied this additional request and approved by ordinance, on May 28, 1970, the amount recommended by the Mayor, i.e., $16,488,263. This total was divided and allocated as follows:

Municipal Court Judicial Staff $ 451,532
Common Pleas Court Judicial Staff 2,126,839
Common Pleas Court Administration 13,909,892
 ___________
 Total $16,488,263

This present mandamus action was instituted on June 16, 1970 to compel the appropriation and payment of the Court's additional request of $5,230,817.

*49 Proceedings Before Judge Montgomery
On June 23, 1970, Judge Harry M. MONTGOMERY, of the Superior Court of Pennsylvania, was specially designated by this Court to hear and decide this case. Judge MONTGOMERY promptly held a pretrial conference, at which time the legal issues were delineated and an agreement was worked out by the parties that defendants would hold and keep available sufficient funds to pay any sums ultimately awarded to the Court. On July 27, 1970, Judge MONTGOMERY issued a Pretrial Order, ordering the parties to argue and brief certain issues and temporarily enjoining the defendants from enforcing a "job freeze" ordered by the Mayor against the Court, and also from reducing the Court's budget. Oral argument was held on August 4, 1970, and Judge MONTGOMERY filed a "Supplemental Pretrial Order" on August 12, 1970. In this Order, Judge MONTGOMERY ruled, inter alia: (1) the Court had the burden of proof to establish the reasonable necessity of its financial requests and none of the parties could take advantage of the usual presumption of reasonableness by virtue of their public office; (2) defendants, as a defense to plaintiff's demand for additional funds in this action of mandamus, could not "reopen" the earlier budget figures, which had been approved by the Mayor and for which appropriations had been made by the City Council, in order to prove that the present appropriation was being used inefficiently or that a more efficient use of present appropriations would cover some or all of the additional requested items; and (3) defendants had a right to a jury trial.[*] The record was closed on August 21, 1970, after extensive testimony had been taken and exhibits produced. At this time, the Court *50 amended its request for funds by reducing the sum of $5,230,817 it had requested in the complaint to $3,962,532, mainly because of the delay in time from the start of the fiscal year (July 1, 1970).
On September 30, 1970, Judge MONTGOMERY issued a mandamus Order against defendants to appropriate and pay the amount of $2,458,000, and made final his injunctive Order of July 27, 1970. A complete tabulation of the original request in the complaint, the amended request, and the final award of September 30, 1970, is as follows:

 Court
 Original Amended Order
 Request Request 9/30/70
Adult Probation $1,782,216 $1,071,937 $ 800,000
Juvenile Probation 539,922 345,032 250,000
Data Processing 453,934 434,175 250,000
Apprehension of Fugitives 335,910 284,322 285,000
Courtroom Personnel 224,452 152,420 100,000
Attorney Fees 300,000 300,000 300,000
Arbitration Fees 390,000 390,000 200,000
Writ Service 100,000 100,000 75,000
Gibson Building Personnel 227,036 113,518 Disallowed
Probation Relocation 24,500 24,500 Disallowed
Repairs  1801 Vine Street 40,000 40,000 Disallowed
Janitorial Staff 56,940 47,431 Disallowed
Microfilm 96,822 88,335 Disallowed
Bail Project 172,857 145,881 Disallowed
Dental Equipment 10,413 10,413 Disallowed
Domestic Relations 61,912 51,593 Disallowed
Total Copy System 23,000 23,000 23,000
Building Services 145,377 129,449 Disallowed
Law Clerks 133,206 133,206 100,000
Station Wagon 2,320 2,320 Disallowed
Prothonotary Relocation 35,000 Withdrawn -
Crime Commission Grant 75,000 75,000 75,000
 __________ __________ __________
 Totals $5,230,817 $3,962,532 $2,458,000

Both parties filed exceptions to the Order of September 30, 1970, and also to the Supplemental Pretrial *51 Order of August 12, 1970, and these exceptions were then argued before Judge MONTGOMERY.[*] The exceptions were dismissed by Judge MONTGOMERY on November 2, 1970, and final judgment was entered in the amount awarded by his Order of September 30, 1970. Both parties appealed to the Commonwealth Court, and thereafter, on November 12, 1970, a petition for plenary jurisdiction under Section 205 of the Appellate Court Jurisdiction Act of 1970 was granted by this Court.

Court's Inherent Power
It is a basic precept of our Constitutional form of Republican Government that the Judiciary is an independent and co-equal Branch of Government, along with the Executive and Legislative Branches. Stander v. Kelley, 433 Pa. 406, 421-424, 250 A. 2d 474; Leahey v. Farrell, 362 Pa. 52, 66 A. 2d 577; Wilson v. Phila. Sch. Dist., 328 Pa. 225, 228, 195 Atl. 90; Commonwealth v. Mathues, 210 Pa. 372, 423-425, 59 Atl. 961; De Chastellux v. Fairchild, 15 Pa. 18, 20; Commonwealth v. Mann, 5 W. & S. 403, 406, 408, 410, 420-421; In re Surcharge of County Commissioners, 12 Pa. D. & C. 471. The line of separation or demarcation between the Executive, the Legislative and the Judicial, and their respective jurisdiction and powers, has never been definitely and specifically defined, and perhaps no clear line of distinction can ever be drawn. However, we must, of necessity, from time to time examine and define some of the respective powers within these undefined boundaries.
*52 Because of the basic functions and inherent powers of the three co-equal Branches of Government, the co-equal independent Judiciary must possess rights and powers co-equal with its functions and duties, including the right and power to protect itself against any impairment thereof. See Commonwealth v. Mann, 5 W. & S., supra; Leahey v. Farrell, 362 Pa., supra; Wilson v. Phila. Sch. Dist., 328 Pa., supra.[*]
Expressed in other words, the Judiciary must possess the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government. This principle has long been recognized, not only in this Commonwealth but also throughout our Nation. See, e.g., Leahey v. Farrell, 362 Pa., supra; Commonwealth v. Mann, 5 W. & S., supra; Commissioners v. Hall, 7 Watts 290; Commonwealth v. Brownmiller, 141 Pa. Superior Ct. 107, 112, 14 A.2d 907; In re Surcharge of County Commissioners, 12 Pa. D. & C., supra; Carlson v. State ex rel. Stodola, 247 Ind. 631, 220 N.E. 2d 532; Noble County Council v. State ex rel. Fifer, 234 Ind. 172, 125 N.E. 2d 709; Knox v. State, 217 Ind. 493, 29 N.E. 2d 405; Judges for Third Judicial Cir. v. County of Wayne, 383 Mich. 10, 172 N.W. 2d 436; Smith v. Miller, 153 Colo. 35, 384 P.2d 738; In re Appointment of Clerk of Court of Appeals, *53 297 S.W. 2d 764 (Ky.); State ex rel. Schneider v. Cunningham, 39 Mont. 165, 101 Pac. 962; State ex rel. Kitzmeyer v. Davis, 26 Nev. 373, 68 Pac. 689; 20 Am. Jur. 2d, Courts, §§ 78, 79; 21 C.J.S., Courts, § 14; Kaplan, There Must Be No Interference with the Courts, VI, Munic. Ct. Rev. 15.
The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent Branches. Leahey v. Farrell, 362 Pa., supra (page 57). However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed. Leahey v. Farrell, 362 Pa., supra (pages 57-58, 59-60); Commonwealth v. Brownmiller, 141 Pa. Superior Ct., supra; In re Surcharge of County Commissioners, 12 Pa. D. & C., supra (page 475).

Reasonable Necessity
In the leading case of Leahey v. Farrell,[*] 362 Pa., supra, the Court of Common Pleas of Cambria County entered a mandamus Order against the County Commissioners and County Controller to compel the payment of funds necessary for salary increases given to the Court stenographers. The Court of Common Pleas had entered the Order without first complying with the provisions of Section 23 of the Act of July 5, 1947, P.L. 1308, 16 P.S. § 304, which required submission of salary increases of Court personnel to the County Salary Board. This Court reversed the lower Court Order because there was no attempt to first comply with the statutory provisions of administrative procedure for *54 salary increases.[*] However, in Leahey, we reaffirmed the inherent powers of the Judiciary to mandamus the payment of sufficient funds out of the public treasury for the efficient administration of the Judicial Branch of Government. The Court pertinently said (pages 57-58): "Should Commissioners, however, neglect or refuse to furnish funds, or sufficient funds, for reasonable judicial functions, and in consequence the efficient administration of the judicial branch of the government is thereby impaired or destroyed, the courts possess the inherent power to require such necessities to be furnished and to direct payment therefor out of the public treasury: see numerous cases cited in 15 C.J. section 272, p. 900 et seq.; 7 Ruling Case Law `Courts' section 12, p. 985; section 62, p. 1033; County of Lancaster v. Brinthall, 29 Pa. 38; McCalmont v. The County of Allegheny, 29 Pa. 417. See comprehensive opinion of Chief Justice MAXEY (then a judge of the Court of Common Pleas of Lackawanna County) In re Surcharge of County Commissioners, 12 Pa. D. & C. 471. In that case, it was held that a judge of a court of common pleas possessed the power to appoint a `secretary or clerk', where no statutory provision existed for such appointment,[**] at a salary fixed by the court, to be paid by the county. The only limitation on this power was held to be that such appointment should be reasonably necessary. This decision is an accurate statement of the law, with which we are in complete accord.[[***]]
*55 ". . . Should the legislature, or the county salary board, act arbitrarily or capriciously and fail or neglect to provide a sufficient number of court employes or for the payment of adequate salaries to them, whereby the efficient administration of justice is impaired or destroyed, the Court possesses inherent power to supply the deficiency. Should such officials neglect or refuse to comply with the reasonable requirements of the court, they may be required to do so by mandamus."[*]
Leahey correctly holds (by necessary implication) that the burden is on the Court to establish that the money it requests is reasonably necessary for "the efficient administration of justice." If a Court is unable to provide an efficient administration of Justice because of insufficient funds to have adequate personnel, or reasonable salaries for personnel, or for other necessary Court administration services, or for construction and maintenance of essential Court facilities, then our whole system of Justice and its administration will undoubtedly be greatly impaired, if not destroyed.
The confidence, reliance and trust in our Courts and in our Judicial system on the part of the Bench *56 and the Bar, as well as the general public, have been seriously eroded. We cannot permit this to continue. In order to improve and expedite Justice, it is both important and imperative that we re-examine and re-evaluate our Courts and their administration, our Judicial processes and our entire Judicial system.
The demands upon our Judicial system have increased tremendously in the last decade, especially in the criminal field. Violent crimes have increased 10% or more every year.[*] The increase in criminal and civil trials, and the number of required pretrial, presentencing and post-trial hearings have virtually swamped the Courts of this Commonwealth, particularly in Philadelphia. New programs, techniques, facilities and expanded personnel have been and will continue to be necessary to meet the mandate of providing and administering a more efficient Judicial system and making Justice for all speedier and more certain.
Defendants contend, inter alia, that the overall problem of financial difficulties which undoubtedly confront and harass the City of Philadelphia should be considered in determining what is "reasonably necessary" for the "efficient administration of Justice by the Courts." The demand, often amounting to necessity, for additional funds for both the maintenance and the improvement of public services and general public welfare, and the essential increases in wages, and the unfortunate rise in costs of nearly every description, is widespread. Nevertheless, the deplorable financial conditions in Philadelphia must yield to the Constitutional mandate that the Judiciary shall be free and independent and able to provide an efficient and effective system of Justice.
*57 The Court does not have unlimited power to obtain from the City whatever sums it would like or believes it needs for its proper functioning or adequate administration. Its wants and needs must be proved by it to be "reasonably necessary" for its proper functioning and administration, and this is always subject to Court review.
Mr. Chief Justice MARSHALL said in McCulloch v. Maryland, 17 U.S. 316, 431, ". . . the power to tax involves the power to destroy; . . ." A Legislature has the power of life and death over all the Courts and over the entire Judicial system. Unless the Legislature can be compelled by the Courts to provide the money which is reasonably necessary for the proper functioning and administration of the Courts, our entire Judicial system could be extirpated, and the Legislature could make a mockery of our form of Government with its three co-equal branches  the Executive, the Legislative and the Judicial.
We have carefully considered all of the defendants' contentions, as well as all of the Court's contentions, but deem further discussion thereof unnecessary.
We agree with Judge MONTGOMERY'S conclusion that "the amount recommended by Mayor Tate and approved by Council is inadequate to meet the reasonable needs of the Court [of Common Pleas] for the present fiscal year." We also agree with his Order of September 30, 1970, allowing the Court $2,458,000. This represents his allowance and specific allocation of certain of the amounts requested by the Court and his disallowance of certain items which the Court had requested. Judge MONTGOMERY'S award was based upon nine months remaining in the City's fiscal year, July 1, 1970 to July 1, 1971. We accordingly reduce the award to reflect the amount of time remaining in this fiscal year (five months from February 1, 1971) and award the Court of Common Pleas the sum of $1,365,555.
*58 Judgment, as modified, is affirmed.
Mr. Justice COHEN took no part in the decision of this case.
CONCURRING OPINION BY MR. JUSTICE JONES:
While I concur in the result achieved by the majority, I must note my disagreement with the precedent thereby established.
At first glance, the majority's statement  "the deplorable financial conditions in Philadelphia must yield to the Constitutional mandate that the Judiciary shall be free and independent and able to provide an efficient and effective system of Justice"  would appear most commendable. Stated differently, the majority essentially holds that whatever amount is "reasonably necessary" for judicial administration must be awarded even though the City may have no available funds. With this proposition I cannot agree; in my opinion, the computation of a "reasonably necessary" amount must consider the financial resources available to the city. However, the record demonstrates that these additional funds have already been set aside and that the City of Philadelphia will not be forced into "involuntary bankruptcy." It is for this fact that I am able to concur.
The majority fails to realize the full import of its standard. If this Court holds that funds must be afforded the Judiciary if "reasonably necessary," could a future majority, while stressing the fundamental co-equality of all three branches of government, logically deny this same standard to the Executive branch of government (the Legislative branch already controlling the power of the purse)? Unless that majority is prepared to nominate the Judiciary for a primus inter pares status, this question must be answered in the negative. Although the Executive, unlike the Judiciary, *59 is ofttimes able to resolve these difficulties in the political arena, I would be most reluctant to rely on the mercurial world of politics as the Executive's only recourse.
Predictably, a future City Council could then be swamped by "reasonably necessary" requests from the Police Department, Sanitation Department, Recreation Department and all other departments of the Executive branch. Unquestionably more money would enable each of these departments to better serve the community. However, the sum of these "reasonably necessary" requests may very well, in some future instance, exceed a municipality's available revenue resources. Projecting the present majority's original premise and realizing all three branches operate in an imperfect world, I must take issue with the majority's overly optimistic precedent.
Certainly taxes could be increased to cover any impending deficit. Certainly those of us in the Judicial branch of government must zealously defend our independence. Perhaps my prediction is a bit too gloomy. However, I would all too eagerly embrace the majority if only it would recognize that what is "reasonably necessary" cannot fail to consider the financial plight of the city.
Mr. Justice EAGEN joins in this concurring opinion.
CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:
I concur in the main with the majority's disposition of this appeal. The Judiciary has the power to command reasonably necessary funds, not only because of its intended status as an independent and co-equal branch of government but also by virtue of the clear mandate of Article 1, Section 11 of the Pennsylvania Constitution, which provides: "All courts shall be open; *60 and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. . . ." It is evident that these fundamental guarantees could not be honored if the Judiciary were without reasonably adequate resources.
I must dissent, however, from that portion of the majority's decision affirming the disallowance of the Philadelphia Court of Common Pleas' request for $145,881 to institute and maintain its proposed bail project. The purpose of the desired project is to evaluate persons accused of crime who cannot afford money bail and to inform the court of those within that group who deserve to be released on their own recognizance. The trial court conceded the laudable motives of the project but held that it fell "without the limits of judicial responsibility." I cannot agree.
As I stated in my recent dissenting opinion in Commonwealth ex rel. Hartage v. Hendrick, 439 Pa. 584, 594, 268 A. 2d 451, 455 (1970): "The imprisonment of an accused prior to a determination of guilt is a rather awesome thing: it costs the taxpayers tremendous sums of money; it deprives the affected individual of his most precious freedom, liberty; it deprives him of his ability to support himself and his family; it quite possibly costs him his job; it restricts his ability to participate in his own defense; it subjects him to the dehumanization of prison; it separates him from his family; and, without trial, it casts over him an aura of criminality and guilt. These deprivations are especially unjustifiable in view of the fact that many of those who are accused of crime and jailed before trial are eventually acquitted. In Philadelphia alone, over twenty-five percent of those accused who are imprisoned prior to trial are eventually discharged of all criminal liability, and many more accused spend more time in *61 jail prior to their trial than they would have had to if they had been released and then tried, convicted and sentenced. In all these cases, and especially in those instances in which the accused is eventually exonerated from all criminal liability, the accused has been made to suffer punishment of the harshest variety  imprisonment  without even an adjudication of guilt, or the judicial imposition of a sentence." Id. at 601-02, 268 A. 2d at 459 (footnotes omitted).
There is no goal more central to the essence of the judicial function than that of ensuring the quality of justice, and to the extent that the proposed bail project would begin to ameliorate some of the injustices arising out of the current administration of bail, funds for its implementation are certainly reasonably necessary. Indeed, the record in the instant case indicates that the proposed bail project has a favorable chance for successful results. The project was modeled after a similar program operated in 1966 and 1967 under the sponsorship of the Philadelphia Bar Foundation. In eighteen months of operation, the Bar Foundation program secured the release of 878 defendants on their own recognizance. Of that group, 229 were eventually discharged from all criminal liability. Edmund DePaul, executive director of the Bar Foundation bail project, testified that the bail project "skip rate" was between 1.9% and 4%, and compared most favorably with an estimated bonding company skip rate of 20%.
It should also be borne in mind that opposition to innovative judicial reform in this area prompted by considerations of economy is likely to be misplaced. At the time of our Hartage decision, the estimated yearly cost of pretrial incarceration in Philadelphia alone was more than $5,000,000 (1,484 prisoners incarcerated and waiting trial at a cost of $8.10 per prisoner per day), see 439 Pa. at 601 n.11, 268 A. 2d at 459 n.11, and the *62 cost is rising. Court Administrator Edward Blake now reports that there are 1,921 prisoners incarcerated and waiting trial in Philadelphia and that the cost per prisoner per day for the fiscal year ending June 30, 1970 was $8.75. In welcome contrast to these figures, Fred Rosenbloom, Chairman of the Advisory Committee of the Philadelphia Bar Foundation bail project, testified that that project saved the City of Philadelphia approximately $500,000 by reducing needless pretrial incarceration. Furthermore, as this experimental program was able to reach only a portion of the deserving cases, the potential exists for much greater savings in the future.
In sum, the proposed bail project presents a rare and realistic opportunity to improve the administration of justice and minimize the social costs of pretrial imprisonment, all at a substantial savings to the taxpayers. For this reason, I would allow the funds requested by the Philadelphia Court of Common Pleas for its implementation and dissent from the majority's disallowance of those funds.
CONCURRING OPINION BY MR. JUSTICE POMEROY:
I join in the opinion of the Court. Much more could, of course, be written about the financial problems of Philadelphia which give rise to this controversy, about the details of the request for additional funds made by the Court of Common Pleas upon the City, and the nature of and need for the activities and facilities they represent. More could and perhaps should be said concerning the difficulties and dangers of this sort of litigation in our framework of government, involving as it does a type of confrontation between the legislative and judicial branches of government in a major metropolitan area, which should be avoided wherever possible, and resorted to only when all else *63 has failed. The pressing and urgent need for prompt decision, however, so that both parties will know where they stand before the fiscal year has further waned, preclude a more extended treatment of those problems than that contained in the opinion.
I deem it appropriate, nevertheless, to comment briefly on one passage in the Court's opinion, and in so doing to indicate some additional considerations which have convinced me of the rightness of the result here reached.
The passage is as follows: "The confidence, reliance and trust in our Courts and in our Judicial system on the part of the Bench and the Bar, as well as the general public, have been seriously eroded. We cannot permit this to continue. In order to improve and expedite Justice, it is both important and imperative that we reexamine and reevaluate our Courts and their administration, our Judicial processes and our entire Judicial system." I am in complete agreement with this comment. I think it should be made clear, however, that the erosion referred to cannot be laid at the door of the defendants in this case, nor can the reappraisal of the judicial processes and system, even in Philadelphia, be considered their sole responsibility. The imperative reexamination which the Court has called for is, as I view it, one which must engage the attention and energy of all branches of government and of the public as well, but remain a principal preoccupation and responsibility of the members of the judiciary, particularly this Court,[1] and of the bar.
It perhaps goes without saying, but no harm can be done by observing, also, that the erosion of confidence in our courts and judicial system is not a recent phenomenon, nor one having a geographical focus in Philadelphia or Pennsylvania. It has been with us in its *64 modern form since before the turn of the century, has been pervasive throughout the United States, and has been directed to the federal judicial system as well as the systems of the several states. As Dean Pound stated in his notable and now famous address of 1906 on "The Causes of Popular Dissatisfaction with the Administration of Justice":[2] "Dissatisfaction with the administration of justice is as old as the law. . . . discontent [with our legal system] has an ancient and unbroken pedigree." Dean Pound went on to admonish, however, that "[W]e must not be deceived by . . . inevitable discontent with all law into overlooking or underrating the real and serious dissatisfaction with courts and lack of respect for law which exists in the United States today."
Space will not permit a cataloging either of the complaints and alarms concerning the administration of justice both nationally and locally in recent years,[3] *65 or of the steps, some faltering and timid, some bold and imaginative, taken to cope with the clamant problems.[4] *66 The point to be made, as I see it, is that the 56 judges comprising the Court of Common Pleas of Philadelphia, able for the first time to speak with a unified voice,[5] mindful of the judicial imperative to improve the administration of justice in Philadelphia, and so stem the erosion of confidence in the courts, made a determination that certain activities of the court, particularly in the field of probation, needed increased emphasis; and that for this and other reasons increased personnel, facilities and equipment were required; and that these requirements would cost an estimated $5.2 million in fiscal 1970. This determination appears from the record to have been responsibly made. As our opinion indicates, the record likewise substantiates the trial judge's holding that the Court of Common Pleas had carried its burden of proof that the activities in question (with the exception of the disallowed items[6]) were "reasonably necessary to enable it to perform its continuing functions as the judiciary of the City." Indeed, the City introduced no evidence to the contrary. *67 In light of the groundswell of criticism and the remedial efforts briefly noted above, the judge's conclusion seems eminently sound.
All of this is not to say that the City Council of Philadelphia has been frugal or niggardly in its financial provision for the courts of that City. There has been a 100% increase in the amount of appropriation for the courts in the last six years and a maintenance of the same relative position in the total city budget for at least the last ten years (i.e., around 3.5% of the total city budget has been allocated to the courts during this period). It must be acknowledged also that critically important needs, especially in the large cities, are competing strenuously for a share of tax revenues, and this in a period of serious inflation. No evidence is required to establish that governments at all levels are experiencing severe financial strains. As the opinion of the Court points out, however, the court system in Philadelphia is not just another competing cause or need; it is itself a separate branch of government, coequal with the executive and legislative branches headed by the defendants in this case. The distinction is one not of degree, but of kind. No doubt the courts must be mindful, in making the estimates of their financial needs, of the needs of the total community and of the problems of the legislative branch in funding them; but the courts having made their determination as being reasonably necessary to performance of their constitutional functions, it is not for the legislative branch to deny the reasonableness or the necessity on the ground that something else is more urgent or more important.[7]
*68 I feel obligated to note, in concluding, that my vote for affirmance is not without some doubt as to the propriety, under the Philadelphia Home Rule Charter, of the Court of Common Pleas making a request before City Council for an appropriation substantially larger than that submitted to the Director of Finance pursuant *69 to Section 6-105 of the Charter. It is true, as Judge MONTGOMERY indicated, that there seems to have been no prejudice to the City in this instance, in that the Council's actual appropriation to the court plus the amount awarded by Judge MONTGOMERY is less than the amount of the original request submitted by the court to the Finance Director. Nevertheless, the interest of orderly budget planning for the entire city government and the court system, a complicated task involving in excess of $500 million for the current fiscal year, would seem to require that the court, whether or not deemed a governmental "agency" within the meaning of Section 6-105, cooperate to the utmost with the fiscal officers of the City in the budget-making process. The point involved may not be governed by the literal holding of Leahey v. Farrell, 362 Pa. 52, 66 A. 2d 577 (1949), but in my view it is within the spirit of the decision in that case.
In closing, Chief Justice VANDERBILT'S wise comments, as valid today as when he made them, seem peculiarly appropriate to the issues presented by this case: ". . . much remains to be done if we would adapt the law and government to the needs of the times. The situations that confront us in our life, nationally and throughout the world, are indeed momentous and some of them are without precedent. The problems of government are complicated and difficult of solution. But must it not be apparent to everyone, as we gaze into the future, that we cannot hope to maintain the way of life which we call American without exercising every effort to preserve to each branch of government its proper sphere and to the states and the Union a due recognition of their proper functions?"[8]
NOTES
[*] The various parties named as defendants are acting in their capacities as officials of the City of Philadelphia: James H.J. Tate, Mayor; Romanus J. Buckley, Finance Director; Philip M. Poorman, Treasurer; Paul D'Ortona, President of City Council; and all of the individual members of City Council.
[**] The Court of Common Pleas of Philadelphia, which is the 1st Judicial District of the Commonwealth of Pennsylvania, has unlimited jurisdiction in all cases except as may otherwise be provided by law (or by the Supreme Court), and has appellate jurisdiction to review convictions in the Municipal Court of Philadelphia: Constitution of Pennsylvania, Article V, Sections 5 and 6, and Section 16(r) of the Schedule to the Judiciary Article. The administration of the Municipal Court is coordinate with the administration of the Court of Common Pleas, and the Municipal Court's financial requests and requirements are included in this complaint.
[*] Defendants later withdrew their demand for a jury trial, and the case was tried before Judge MONTGOMERY without a jury.
[*] The Court of Common Pleas petitioned this Court, on October 6, 1970, before the exceptions were filed, to assume plenary jurisdiction under Section 205 of the Appellate Court Jurisdiction Act of 1970. We denied this petition "without prejudice to file a subsequent petition at an appropriate time."
[*] The authorities of other jurisdictions on the separation of powers and problems arising from the inherent weakness of the Judiciary Branch are legion. See, e.g., Smith v. Miller, 153 Colo. 35, 384 P.2d 738; Carlson v. State ex rel. Stodola, 247 Ind. 631, 220 N.E. 2d 532; Florencio Lira v. L.A. Billings, 196 Kan. 726, 414 P. 2d 13; In re Appointment of Clerk of Court of Appeals, 297 S.W. 2d 764 (Ky.); Gray v. Clerk of Common Pleas Court, 366 Mich. 588, 115 N.W. 2d 411; State v. Pfeiffer, 163 Ohio St. 149, 126 N.E. 2d 57.
[*] This case is relied upon by both parties.
[*] This problem is not at issue in the instant case because the Court of Common Pleas properly conformed with all the requirements of Section 8-103 of the Philadelphia Home Rule Charter of April 17, 1951 and all other administrative procedures, before both the Mayor and City Council, before instituting suit.
[**] Italics in Leahey v. Farrell.
[***] The test in In re Surcharge of County Commissioners, 12 Pa. D. & C., supra (adopted in Leahey), was stated thus (at page 475): "That courts have inherent power to do all things that are reasonably necessary for the proper administration of their office within the scope of their jurisdiction is a well-settled principle of law."
[*] It is well settled, as all the parties agree, that "Mandamus is an extraordinary writ which lies to compel the performance of a ministerial act or mandatory duty where there is clear legal right in the plaintiff, a corresponding duty in the defendant, and a want of any other appropriate and adequate remedy: Borough of Easton v. Lehigh Water, 97 Pa. 554, 560; Goodman v. Meade, 162 Pa. Superior Ct. 587, 60 A. 2d 577. However, even in such cases its issuance [mandamus] is not a matter of right but in certain circumstances is a matter for the sound discretion of the court: Waters v. Samuel, 367 Pa. 618, 80 A. 2d 848." Travis v. Teter, 370 Pa. 326, 330, 87 A. 2d 177. This principle was reiterated in Boslover A.A. B. Assn. v. Philadelphia Redevelopment Authority, 425 Pa. 535, 538, 229 A. 2d 906, and in Unger et al. v. Hampton Township, 437 Pa. 399, 401, 263 A. 2d 385.
[*] See the Annual and Semi-Annual Reports of the F.B.I. Crime Index.
[1] See Art. V, Sec. 10 of the Pennsylvania Constitution.
[2] Roscoe Pound, address delivered at the annual meeting of the American Bar Association, 29 ABA Ann. Rep. 395-417 (Part I, 1906).
[3] In Chief Justice Earl WARREN'S annual message to the American Law Institute in 1957, he stated, ". . . interminable and unjustifiable delays in our courts are today compromising the basic legal rights of countless thousands of Americans and, imperceptibly, corroding the very foundations of constitutional government in the United States." See also Warren, Delay and Congestion in the Federal Courts, 42 J. Am. Jud. Soc. 6 (1958); Warren, The Administration of the Courts, 51 J. Am. Jud. Soc. 196 (1968); Chief Justice Warren E. BURGER, The State of the Judiciary  1970 (address to the American Bar Association, 1970), 56 ABA J 929 (1970); Burger, Agenda for Change (address at testimonial dinner in honor of Chief Justice John C. BELL, JR., of Pennsylvania, 1970), 54 J. Am. Jud. Soc. 232 (1971); Exclusive interview with Chief Justice BERGER, LXIX U.S. News & World Report 32 (December 14, 1970). With particular reference to the problems of court congestion and delay, see Zeisel, Kalven and Buchholz, Delay in the Court, Little, Brown & Co. 1959; Lagging Justice, Ed. by Glenn R. Winters, Annals of the American Academy of Political and Social Science (March 1960). See also, as illustrative of the large volume of material on this subject, Luce, The Rule of Law and the Administration of Justice (address to the Section of Judicial Administration of the American Bar Association, St. Louis, 1961); Kaufman, Courts in Crisis: Progress Versus Intransigence, 52 ABA J 1026 (1966); Banks, The Crisis in the Courts, Fortune Magazine, December 1961, the last paragraph of which reads: "The American courts must move fast if they would purge themselves of their present low esteem. If they do, they can be the principal institution that gives point to American national development. If they do not, there will not be much point to the development." For a comprehensive survey of the contemporary problems of judicial administration, with particular emphasis on the trial courts, see `The Courts, the Public and the Law Explosion', edited by Harry W. Jones for The American Assembly, Columbia University (Prentice-Hall, Inc., 1965), together with the Final Report of the Twenty-Seventh American Assembly held April 29-May 2, 1965 on the same subject.
[4] See in general The Improvement of the Administration of Justice, A Handbook Prepared by the Section of Judicial Administration of the American Bar Association, 5th Ed. (1971), and the bibliographies contained therein; Pound. Modern Unified Court Organization, 23 J. Am. Jud. Soc. 225 (1940); Pound, R., Organization of Courts (1940); Vanderbilt, A., Minimum Standards of Judicial Administration, National Conference of Judicial Councils (1949); Elliott, S., Improving Our Courts, Oceana Publications (1959); Report of the National Conference on Judicial Selection and Court Administration, 43 J. Am. Jud. Soc. 114 (1959); Articles on the Model Judicial Article, 47 J. Am. Jud. Soc. (June 1963).

With particular reference to the situation in Pennsylvania, see Schulman, S., Toward Judicial Reform in Pennsylvania (U. of Pa. L.R. 1962); The Institute of Judicial Administration, A Report to the Allegheny County Bar Association on the Courts of Allegheny County (1960); The Consensus on the Pennsylvania Judicial System, as adopted by A Citizens Conference on the Modernization of Pennsylvania's Judicial System, January, 1964, under the sponsorship of the Joint Committee on the Effective Administration of Justice and the Pennsylvania Bar Association, together with the background addresses delivered at the conference (Pamphlet of the Pennsylvania Bar Association, 1964); Article V, The Judiciary, of the Pennsylvania Constitution, adopted by the Pennsylvania Constitutional Convention of 1967 and approved by the electorate April 23, 1968, effective January 1, 1969.
[5] The 10 separate courts of common pleas of Philadelphia County, the Orphans' Court of Philadelphia County, the County Court of Philadelphia County, the Courts of Quarter Sessions of the Peace, and of Oyer and Terminer and General Jail Delivery of Philadelphia County were abolished by the new judiciary article, and all of their jurisdiction and powers vested in one court of common pleas. Article V, Sec. 5, and Sec. 16(t) of the Schedule to Article V.
[6] The learned trial judge disallowed sums requested for the bail project, microfilming of court records, building repairs, etc. These items are in the borderline category as between the judicial and administrative functions. My vote for affirmance is without prejudice to a reconsideration of these items, should the occasion later arise, on a more extensive record delineating with precision the nature of the functions in question.
[7] To put the cost of financing the courts in broad perspective, the following analysis from data derived from United States census figures is of interest: "Public costs in America for Justice are approximately $4 to $5 billion a year. This figure includes courts, police, prosecution and corrections and encompasses both civil and criminal law administration. About 60 per cent is devoted to police protection and prosecution, some 20 per cent supports the courts and 20 per cent is spent for corrections. The gross estimate is only 2.5 per cent of the $150 billion in direct expenditures of all American governments in 1962 for every purpose." Saari, An Overview of Financing Justice in America, 50 J. Am. Jud. Soc. 296 (1967).

The 1970 Statistical Abstract for the Commonwealth of Pennsylvania shows a total expenditure during the period July 1, 1968 to June 30, 1969 for the judicial branch of $8 million against a total for all branches of government of $2.2 billion, or only about 4/10 of 1%. This is not a meaningful comparison, however, because in this state the cost of the judicial establishment is largely borne by the counties and the cities of Philadelphia and Pittsburgh. The state expenditure is principally for judicial salaries. On a consolidated basis, the only figures presently available to the writer are those which are contained in Professor Schulman's work, Toward Judicial Reform in Pennsylvania, supra, for the year 1957. While now out of date, the author's unofficial estimate relative to that year is worth citing: "The cost of the judicial system in Pennsylvania in 1957 was approximately 30 million dollars, not counting the cost of correctional and penal institutions. The state's share was approximately 4½ million, the balance being borne by the counties and the cities of Philadelphia and Pittsburgh." Ibid. at 181.
A strong argument can and has been made that the Pennsylvania system of divided financial responsibility between the state, its counties and the two large cities is illogical in light of the unified judicial system established by the new judiciary article of our Constitution. Weis, A New Name and a New Financial Policy for the Courts, 41 Pa. Bar Assn. Quarterly 189 (1970). The author there concludes: "It seems obvious that the time has come to implement the unified court concept on a statewide fiscal, as well as administrative basis. The Commonwealth should assume all the costs of operating the courts in this state, just as the federal government finances all the courts of the United States."
[8] Vanderbilt, A., The Doctrine of the Separation of Powers and Its Present Day Significance, 142 (U. of Nebraska Press, 1953).