**ANDERSON COUNTY QUARTERLY COURT, Petitioner-Appellant,**

v.

**JUDGES OF the 28TH JUDICIAL CIRCUIT, Respondents-Appellees.**

Court of Appeals of Tennessee, Eastern Section.

Dec. 12, 1978.

James N. Ramsey and Jan Hicks, Clinton, for petitioner-appellant.

James B. Scott, Jr., Clinton, for respondents-appellees.

## OPINION

LEWIS, Judge.

This case arises out of the use of the former Chancery Courtroom in the Anderson County Courthouse. Anderson County was formerly a part of the Nineteenth Judicial Circuit and the Second Chancery Division. The Legislature had also previously created a Law and Equity Court for the County. When the present courthouse was constructed, all these courts were housed on the third floor of that building.

In 1974, the Legislature created the Twenty-Eighth Judicial Circuit, composed only of Anderson County. The Law and Equity Court became the Chancery Court and, as a result, Anderson County was removed from the Second Chancery Division. Therefore, because of a general current lack of need, the courtroom formerly used by the Chancery Court fell into infrequent use by the Twenty-Eighth Judicial Circuit.

The appellant, at its meeting of June 20, 1977, entertained a motion to allow the Tennessee Department of Employment Security to have temporary use of the former Chancery Courtroom. On June 24, 1977, Judge Sidney Davis issued an ex parte injunction, enjoining the appellants and "all other officials of Anderson County" from using the Chancery Courtroom for "any purpose except as a witness room and grand jury room".

Appellant filed a motion to dissolve the injunction and, after an evidentiary hearing, the trial judge recognized the inherent power of the Circuit and Chancery Courts to require adequate facilities, found that the space involved was necessary for the operation of the Twenty-Eighth Judicial Circuit, and entered a permanent injunction denying the use of the former Chancery Courtroom by appellant and all other county officials without the approval of one of

the Judges of the Twenty-Eighth Judicial Circuit or their designated agents.

From that decision, appellant has appealed and assigns error.

The first and third assignments of error, which we discuss together, are:

1. The Trial Court erred in holding that Circuit and Chancery Judges have an inherent power over allocation of space in a county courthouse.

3. The Trial Court erred in finding that the old Chancery Courtroom was necessary to the operation of the courts of the 28th Judicial Circuit, and that it is used for judicial purposes on an average of three times each week.

Our democracy is based on a constitutional form of government. As such, one of its basic and fundamental features is the vesting of governmental powers in three branches, the executive, legislative and judicial. It is generally acknowledged that these branches are "coordinate, independent, coequal, and potentially coextensive." See generally 16 Am.Jur.2d Constitutional Law § 210 (1964). See also Tenn.Const. art. II, §§ 1–2 (1870).

It has been declared that the division of governmental powers into executive, legislative, and judicial represents probably the most important principle of government declaring and guaranteeing the liberties of the people, and that it is a matter of fundamental necessity, and is essential to the maintenance of a republican form of government. 16 Am.Jur.2d Constitutional Law § 212 (1964).

The three branches of government are independent in exercising their assigned duties, whether they be constitutional in nature, statutory or otherwise. Thus, our Supreme Court has stated:

"It will therefore be observed that the power of the legislature over the judicial branch of the government must conform to the limitations expressed in the Constitution. It should be noted that the Constitution does not reserve to the Legisla-

ture all right to deal with any other branch of the government with certain exceptions, but there is an express prohibition of any branch of the government exercising any power properly belonging to another branch except in the cases expressly directed or permitted by the Constitution itself." Moore v. Love, 171 Tenn. 682, 686, 107 S.W.2d 982, 983 (1936), citing Lawyers' Tax Cases, 55 Tenn. (8 Heisk.) 565; The Judges' Cases, 102 Tenn. 509, 629, 53 S.W. 134, 138 (1899).

As it has been aptly stated:

Each department of the government must exercise its own delegated powers, and unless otherwise limited by the constitution, each exercises such inherent power as will protect it in the performance of its major duty; one department may not be controlled or even embarrassed by another department unless the constitution so ordains. 16 Am.Jur.2d Constitutional Law § 213 (1964).

The courts derive their basic authority from the constitution which, by necessity, grants all powers necessary to engage in the complete performance of the judicial function. However, the courts are caught in a unique dilemma in performing that function.

As a co-equal branch of government, the judiciary is the least co-equal:

[T]hey constitute an independent branch of government, critically necessary to the balance of our constitutional system. Yet they are expected to eschew the normal political process and, unlike competitors for public resources, are prohibited from cultivating their own constituencies and utilizing lobbyists. Hazard, McNamera & Sentilles, Court Finance and Unitary Budgeting, 81 Yale L.J. 1286 (1972). [hereinafter cited as Hazard].

Further:

[t]he judiciary has no power to appropriate funds, as does the legislative branch, and . . . no power to exercise a veto as a bargaining device, as does

the executive . . . . Taggart, *Judicial Power—The Inherent Power of the Courts to Compel Funding for Their Own Needs—In Re Juvenile Director, 87 Wash.2d 232, 552 P.2d 163 (1976), 53 Wash.L.Rev. 331 (1978) [hereinafter cited as Taggart].

The problem is exacerbated because:

[J]udges wield little political power and are afflicted with a self-effacing attitude of judicial restraint. Traditionally, the court system has been the "nonsqueaky wheel" [of public finance]. Thus . . in deference to separation of powers, judges will lean over backward to avoid encroaching on the legislative branch's [power] . . . . Carrigan, *Inherent Powers of the Courts*, Nat'l C. St. Judiciary 1 (1973) [hereinafter cited as Carrigan].

Whatever negative aspects the separation of powers doctrine has on the ability of the courts to operate effectively and efficiently, there is a corollary positive aspect of the doctrine.

However, the separation of powers doctrine, properly understood, imposes on the judicial branch not merely a *negative* duty *not* to interfere with the executive or legislative branches, but a *positive* responsibility to perform its own job efficiently. This *positive* aspect of separation of powers imposes on courts affirmative obligations to assert and fully exercise their powers, to operate efficiently by modern standards, to protect their independent status, and to fend off legislative or executive attempts to encroach upon judicial perogatives. *Id.* at 1–2.

■ This doctrine of separation of powers is not absolute. It is complemented in constitutional theory by the doctrine of checks and balances.

Indeed, there is evidence that the drafters of the constitution viewed checks and balances as an integral part of the separation of powers doctrine. Madison, in discussing separation of powers, ar-

gued: "[U]nless these departments [the three branches of government] be so far connected and blended as to give to each a constitutional control over the others, the degree of separation which the maxim requires, as essential to a free government, can never in practice be duly maintained." *The Federalist No. 48* (J. Madison). Taggart, *supra* at 335 n. 18.

This is important because to the extent that any one branch of government becomes subservient to another, its ability to act in its role of providing a "check and balance" is curtailed and the effective concept of government ordained by our constitution rapidly loses its viability as envisioned by the founding fathers.

To offset their politically disadvantageous position and to insure the orderly and efficient operation of their functions, the courts, in recent years, have been more willing to utilize their inherent powers.

The concept of inherent powers has been utilized by the courts most often and strongly in insuring proper funding of the judicial function. In this context, the concept has been defined in this manner:

The courts are a constitutionally created branch of government whose continued effective functioning is indispensible; performance of that constitutional function is a responsibility committed to the courts; this responsibility implies the authority necessary to carry it out . . . . Hazard, *supra* at 1287.

The phrase "inherent powers" is used to refer to powers included within the scope of a court's jurisdiction which a court possesses irrespective of specific grant by constitution or legislation. 20 Am.Jur.2d *Courts* § 78 (1964).

The term "inherent power of the judiciary" means that which is essential to the existence, dignity and functions of the court from the very fact that it is a court. *In Re Integration of Nebraska State Bar Ass'n*, 133 Neb. 283, 286, 275 N.W. 265, 267 (1937).

*Inherent powers* consist of all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective. Carrigan, *supra* at 2.

■ The inherent power that vests in a court at its creation, however, is not unlimited.

The inherent powers of a court do not increase its jurisdiction; they are limited to such powers as are essential to the existence of the court and necessary to the orderly efficient exercise of its jurisdiction. 20 Am.Jur.2d *Courts* § 78 (1964).

Primarily, the use of the inherent powers doctrine has been, but not exclusively limited to, securing relatively minor fiscal expenditures necessary for the courts to operate. *See e. g., Powers v. Isley*, 66 Ariz. 94, 183 P.2d 880 (1947) (court has the inherent power to fix the salaries of court reporters); *Millholen v. Riley*, 211 Cal. 29, 293 P. 69 (1930) (inherent power to fix salary of secretaries to appellate courts); *Smith v. Miller*, 153 Colo. 35, 384 P.2d 738 (1963) (fixing salaries of clerks in trial court and probation officers); *State v. Rush*, 46 N.J. 399, 217 A.2d 441 (1966) (holding counties responsible for paying court appointed attorneys); *Judges of Third Judicial Circuit v. County of Wayne*, 383 Mich. 10, 172 N.W.2d 436 (1969) (would allow court to employ a law clerk or law clerks).

In *Noble County Council v. State*, 234 Ind. 172, 125 N.E.2d 709 (1955), it was held that judges have the authority to determine the necessity and choice of additional court employees, in this case a probation officer. In *Montgomery v. Board of Chosen Freeholders*, Cir. No. L–23910–70, Super.Ct., Passaic Co., N.J. (1971), the issue concerned the need for additional clerks and how many would be employed.

In *Milburn v. Burns*, 1 Ariz.App. 147, 400 P.2d 354 (1965), the court used its inherent powers to determine the time a salary increase would take effect.

Facilities and equipment have also been the subject of the use of inherent powers. *In The Matter of Repairs and Rehabilitation of the Facilities of the La Porte Circuit Court*, La Porte Circuit Court, La Porte, Ind. (1968), modernizing, remodeling and air conditioning of the courthouse were accomplished by mandate at the trial court level.

Inherent powers have been used to control courthouse space. *Zangerle v. Court of Common Pleas*, 141 Ohio St. 70, 46 N.E.2d 865 (1943), upheld a court's claim to courthouse space and justified the ouster of county officers from space needed to expand court services. And, in *Board of Commissioners v. Stout*, 136 Ind. 53, 35 N.E. 683 (1893), the court stated:

The "courthouse", as the term implies, is chiefly for the use of the court, the remaining uses being subordinate and to a great extent incidental. *Id.* at 62, 35 N.E. at 685. [involving use and operation of county courthouse elevator]

■ But, however broad and justifiable the use of inherent powers may be, it is not a license for unwarranted flexing of the judicial power. The generally recognized standard for applying the inherent powers doctrine requires its use to be reasonable and necessary.

That courts have inherent power to do all things that are *reasonably necessary* for the proper administration of their office within the scope of their jurisdiction is a well-settled principle of law. *In Re Surcharge of County Commissions*, 12 Pa.D. & C. 471, 475 (Lackawanna Co. Comm.Pl.1928) [emphasis added]

That this standard is broad and nebulous is without question. However, a recent decision has discussed it in depth. In 1976, the Supreme Court of Washington, in *In Re Juvenile Director*, 87 Wash.2d 232, 552 P.2d 163 (1976), imposed, "for the first time in any jurisdiction, a strict standard which the court must meet to prove . . . reasonable necessity . . . ." Taggart, *supra* at 331.

There, the superior court of Lincoln County proposed a salary increase for its director of juvenile services. The County Board of Commissioners rejected the in-. crease and refused to honor the subsequent order to pay. The trial judge found an inherent power in the court to agree with the director on his compensation. Thus, a statute granting the board the power to determine the director's salary was held to be unconstitutional as an infringement of the court's power to appoint. *Id* at 235, 552 P.2d at 165.

On appeal, the Washington Supreme Court did not agree that the statute was unconstitutional. *Id.* at 236, 552 P.2d at 166. But, the court did agree that under some circumstances the court has the inherent power to set salaries of court personnel. The court asserted that this power should only be used by the court when reasonable necessity could be shown by "clear, cogent, and convincing proof". *Id.* at 251, 552 P.2d at 174.

In an in-depth evaluation of *In Re Juvenile Director*, one commentator notes:

[T]hat by requiring courts to meet a strict standard of proving reasonable necessity before they are allowed to compel funding of their own operations under the inherent powers doctrine, the Washington Supreme Court has correctly perceived the pitfalls and illusory attractiveness of liberal application of the doctrine and has correctly determined that constitutional and political considerations require great restraint in its application. Taggart, *supra* at 333.

The commentator notes that many jurisdictions require proof beyond a reasonable doubt in many types of civil actions but that this court does not equate a "clear, cogent, and convincing proof" standard with proof beyond a reasonable doubt. "Rather, it is a standard of proof lying somewhere between a preponderance of the evidence and the more rigorous standard of proof more commonly found in criminal proceedings." *Id* at 332 n. 11.

This standard of proof is greater than that utilized in other jurisdictions which have considered the matter. *See, e. g., Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193, cert. denied, 402 U.S. 974, 91 S.Ct. 1665, 29 L.Ed.2d 138 (1971). These other jurisdictions generally only require the normal preponderance of the evidence standard of civil litigation. In general, the burden of establishing the reasonable necessity for involving inherent powers has rested on the court. *See generally Commonwealth ex rel. Carroll v. Tate, supra.*

Of import here is the Washington Supreme Court's purpose in establishing such a high standard of proof. The court discusses the doctrines of separation of powers and checks and balances upon which the doctrine of inherent powers rests. The decision notes a serious potential for abuse of the separation of powers doctrine, especially in the area of judicial planning, and the counter-check that is afforded through use of the inherent powers doctrine.

Justice Utter, speaking for the court also recognized the potential abuse of inherent power by the judiciary itself through its interference with government financing, an essentially political act. He noted:

The judiciary is isolated from the opinion gathering techniques of public hearings as well as removed from politically sensitive, proportionately elected representatives. [T]he judiciary's image of impartiality and the concomitant willingness of the public to accept its decisions as those of a fair and disinterested tribunal may be severely damaged. *In Re Juvenile Director, supra*, 87 Wash.2d at 249, 552 P.2d at 173.

The court's point is:

Because the public is the final arbiter of disputes between the branches, it is necessary that the public find acceptable the exercise of this inherent power if it is to have any long term usefulness. Taggart, *supra* at 336.

The Washington Supreme Court's admonition to carefully control the use of inher-

ent powers is well taken. Its strict standard of proof requiring the proving of reasonable necessity by "clear, cogent and convincing" evidence is not only a useful tool in protecting the integrity of the doctrine but also in protecting the integrity of the judicial system itself.

As has been previously noted, the use of the inherent powers doctrine has been closely related to judicial financing. And, it is in that context that the carefully written opinion of *In Re Juvenile Director* is set.

However, judicial finances should not be considered the limiting factor of close judicial scrutiny of the doctrine itself. The hazards which present themselves so clearly in the area of judicial financing spill over into other areas of intergovernmental branch conflict.

■ In light of the lack of any guiding precedent in Tennessee decisions and the theoretical and practical soundness of the opinion of *In Re Juvenile Director*, we take this opportunity to adopt the principle that in utilizing the inherent powers doctrine, the court asserting the power must establish reasonable necessity by "clear, cogent and convincing proof."

Appellant argues that Article II, Sections 1 and 2 of the Tennessee Constitution places the exclusive power of the expenditure of the public moneys in the legislative branch of government. *See State ex rel. Weldon v. Thomason*, 142 Tenn. 527, 221 S.W. 491 (1919).

Further, the state legislature has properly delegated the taxing power to the County Quarterly Court in order that it may erect, repair and maintain courthouses. *See Tenn.Const.* art. II, § 29 (1870); T.C.A. §§ 5–706 and 5–901; *Cannon County v. Hoodenpyle*, 26 Tenn. (7 Hum.) 145 (1846).

Finally, that as an incident of its taxing and appropriation power, the County Quarterly Court has control of all county property, including the allocation of courthouse space. *See* T.C.A. § 5–701; *Driver v. Thompson*, 49 Tenn.App. 646, 358 S.W.2d 477, cert. denied, id. (Tenn.1962); *State ex rel. Brooks v. Eblen*, 185 Tenn. 566, 206 S.W.2d 793 (1947).

We note at this point that appellant's reliance on *Driver v. Thompson*, for the proposition that "implicitly the County Judge himself had no right to appropriate space even if his office was 'inadequate'", is not controlling here as to the validity of the inherent powers doctrine. The issue under discussion in *Driver v. Thompson* goes only to the proposition of whether or not the sheriff of the county is authorized and empowered under law to order changes in the structure of a courthouse as contemplated by a county judge. Furthermore, *Driver v. Thompson* was involved with a court lacking general jurisdiction, an issue underlying the inherent powers doctrine that is better left for a more appropriate factual pattern.

■ The effective functioning of the courts is indispensible to a democracy; to see that they function effectively is a responsibility of the courts; the inherent power to carry out this responsibility is implied from the very fact of the responsibility. The Circuit and Chancery Courts of this State *must* have and *do* have the inherent powers necessary to insure the adequate fulfillment of their judicial functions.

■ However, the record does not establish the requisite reasonable necessity for involving the inherent powers doctrine to maintain control of the former Chancery Courtroom.

At the present time there is a Circuit Judge and a Chancellor serving the Twenty-Eighth Judicial Circuit. Each has an adequate courtroom with jury facilities.

The trial Judge found that the old Chancery Courtroom was used for trial of cases on an average of three times each week and was necessary for the operation of the Twenty-Eighth Judicial Circuit. We have searched the record and are unable to find

any evidence to substantiate this conclusion. While Mr. Lawson, the Clerk and Master, did testify that the courtroom was used "at least three times a week for different occasions", the proof does not establish that this use was for functions of the Twenty-Eighth Judicial Circuit or that use of the courtroom at least three times a week was necessary for the adequate fulfillment of the functions of the Twenty-Eighth Judicial Circuit.

Mr. Lawson began keeping records on the use of the courtroom after the controversy surrounding the courtroom began.[1]

As this record shows, this room is used only infrequently for the Twenty-Eighth Judicial Circuit. From January 4 through October 25, the record shows that the old courtroom was used fifteen times for business related to the Twenty-Eighth Judicial Circuit. This included three times by the Special Master and six times as a witness room.

That it would be convenient to have the use of this room there is no doubt, but convenience is not the criteria for utilization of inherent powers.

■ In a case such as this the Court of Appeals reviews the law and the facts de novo upon the record from the trial court with the decision of the trial court accompanied by a presumption of correctness unless the preponderance of evidence is otherwise. T.C.A. § 27–303. If the evidence preponderates against the finding of the trial judge it is the duty of the Court of Appeals to enter such judgment as the law and the evidence warrants. *Loftis v. Stuyvesant Insurance Co.*, 54 Tenn.App. 371, 390 S.W.2d 722 (1964).

From a review of this record we find that the Judges of the Twenty-Eighth Judicial Circuit have adequate courtroom facilities and that under the confined facts of this case, under either the higher standard of clear, cogent and convincing proof or merely a preponderance of the evidence, the appellees have failed to establish such reasonable necessity for the use of the courtroom that will allow them to utilize their inherent powers.

■ Appellant, by assignment of error two (2), contends:

2. The Trial Court erred in granting an injunction when there was no eminent

---

1. Record of use of Old Chancery Courtroom—Spot Record
   Jan. 4, 1977—used in Evening
   Jan. 5, 1977—used by Welfare Dept.
   Jan. 27, 1977—used for Witness Room
   Feb. 3, 1977—used by County Agent @ 7:00 P.M.
   Feb. 7, 1977—used for Jury Room
   Feb. 10, 1977—used by County Agent @ 7:00 P.M.
   Feb. 15, 1977—used by Veterans @ 8:30 A.M.
   Feb. 16, 1977—used for Court hearing—All Day
   Feb. 17, 1977—used by County Agent @ 7:00 P.M.
   Feb. 21, 1977—Truancy Court—2:00 P.M.
   Feb. 24, 1977—Juvenile Court
   Feb. 25, 1977—Chancellor Inman used for Court Hearings
   Mar. 7, 1977—Truancy Court
   Mar. 7, 1977—Welfare Dept. Meeting
   Mar. 10, 1977—used for depositions
   Mar. 11, 1977—used by School Department for meeting
   Mar. 14, 1977—used for meeting in evening
   Mar. 15, 1977—used by Chancery Court for witness room
   Mar. 15, 1977—Truancy Court
   Mar. 21, 1977—used by Chancery Court for witness room
   Mar. 28, 1977—used by Chancery Court for witness room
   Mar. 29, 1977—used by Chancery Court for witness room
   Mar. 30, 1977—Welfare Dept. had meeting
   Mar. 31, 1977—Welfare Dept. had meeting
   April 5, 1977—Health Council Group @ 8:00 P.M.
   Apr. 12, 1977—used for meeting
   Apr. 26, 1977—Special Master's Hearing 9:00 AM to 4:00 PM
   May 3, 1977—Special Master's Hearing 9:00 A.M.
   May 9, 1977—Chancery Court—Judge Hardin
   May 11, 1977—Used by Special Master
   June 9, 1977—used for witness room
   June 23, 1977—Welfare Dept. used for meeting
   July 7, 1977—George Legg used for depositions
   October 3, 1977—Courtroom used for Grand Jury
   Oct. 4, 1977—Courtroom used by Chancellor Prince, had Court
   Oct. 25, 1977—used as Jury Room
   NOTE: Truancy Court is usually held in the Old Chancery Courtroom each Monday at 1:00 P.M.

threat that the Quarterly County Court would deprive the judiciary of their use of the former Chancery Courtroom.

This question is raised for the first time on appeal. Even if it be error, it must be considered waived under Rule 12(4) of the Court of Appeals. *City of Kingsport v. Lay*, 62 Tenn.App. 145, 459 S.W.2d 786 (1970).

By assignment of error number four (4), appellant contends:

4. The Trial Court erred in denying Appellant its statutory right to a jury trial on the issue of fact as outlined in Appellant's timely demand for a jury

It is appellant's contention that pursuant to Tennessee Code Annotated § 21–1011 they are entitled to a jury trial. This contention is without merit.

Tennessee Code Annotated § 21–1011 provides that:

Either party to a suit in chancery is entitled, upon application, to a jury to try and determine any material fact in dispute, save in cases involving complicated accounting, as to such accounting, and those elsewhere excepted by law or by provisions of this Code, and all issues of fact in any proper case shall be submitted to one jury.

This Court, in *Doughty et al. v. Grills et al.*, 37 Tenn.App. 63, 260 S.W.2d 379, 386 (1952), said:

"[c]ases of purely equitable cognizance falling under the inherent jurisdiction of the Chancery Court, not only are not within the constitutional guaranty of trial by jury because of the fact that the guaranty refers to common law actions only, but that they are within the exception to Code Section 10–574 [now T.C.A. § 21–1011] providing for juries in Chancery,—that is, they are among the cases 'elsewhere excepted by law or by provisions of this Code.'"

Further:

"[b]y virtue of the language, 'elsewhere excepted by law or by provisions of this Code' . . . it is meant to exclude from the operation of that section not only those cases expressly excluded by some other provisions of the Code but suits in which under the common law a litigant was not entitled to a jury as a matter of right. This means that cases of purely equitable cognizance falling under the inherent jurisdiction of the Chancery Court are excepted because there was no right at common law to a jury trial in an equity case.

"The present suit being one of that type, [one seeking an injunction] there was neither a constitutional right nor a statutory right to a trial by jury; and hence, the rules applicable in courts of equity, independent of the statute and the constitution, govern." *Id.* 260 S.W.2d at 387.

An injunction proceeding, such as the one before us, does not come within the provisions of T.C.A. § 21–1011 providing for juries in certain Chancery cases.

It results that assignments of error One, Two and Four are overruled, and assignment of error Three is sustained.

The judgment of the trial Court is reversed and this cause dismissed with cost to appellees.

PARROTT, P. J., and GODDARD, J., concur.