**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 28, 2006

46TH CIRCUIT TRIAL COURT,

    Plaintiff, Counter-Defendant,
    Third-Party Plaintiff-Appellee,

v

No. 128878

COUNTY OF CRAWFORD AND CRAWFORD
COUNTY BOARD OF COMMISSIONERS,

    Defendants, Counter-Plaintiffs,
    Third-Party Plaintiffs-Appellants,

and

COUNTY OF KALKASKA,

    Intervening Defendant,
    Counter-Plaintiff, Third-Party
    Plaintiff-Appellant

and

COUNTY OF OTSEGO,

    Third-Party Defendant

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider this funding dispute between the 46th Circuit Trial Court (hereafter the Trial Court) and two of its three county funding units. This case involves a conflict between the legislative branch's exercise of the "legislative power" to appropriate and to tax, and the judicial branch's inherent power to compel sufficient appropriations to allow the judiciary to carry out its essential judicial functions. Specifically, the Trial Court seeks to compel the defendant counties to appropriate funding for the enhanced pension and retiree health care plans it deems necessary to recruit and retain adequate staff to allow it to carry out its essential judicial functions. The circuit judge found in favor of the Trial Court, holding that the benefits were "reasonable and necessary" to the court's ability to perform its constitutional responsibilities and that the counties created for themselves a contractual obligation to appropriate funds for the enhanced pension and retiree health care plans. The Court of Appeals affirmed. Because we conclude that such benefits were not "reasonable and necessary" to the "serviceability" of the court, and because we conclude that the defendant counties were not contractually obligated to appropriate funds for the enhanced benefits plan sought by the Trial Court, we reverse the judgment of the Court of Appeals and remand this case to the circuit judge for entry of a judgment in favor of defendants.

## I. FACTS AND PROCEDURAL HISTORY

The Trial Court's predecessor, the 46th Circuit Court, was the circuit court servicing Otsego, Crawford, and Kalkaska counties. Pursuant to Administrative

Order No. 1996-9, 451 Mich civ, the 46th Circuit Court, along with the district and probate courts within these counties,[1] became part of a demonstration project designed to evaluate the feasibility of consolidating various court functions into a single entity known as the 46th Circuit Trial Court.[2] The chief judge of the 46th Circuit Court was appointed the Trial Court's chief judge (hereafter Chief Judge), and Otsego County was designated as the Trial Court's control unit.

In order to facilitate this consolidation, the Trial Court began a large-scale administrative reorganization for the purpose of standardizing wages, benefits, and personnel policies. During this reorganization in the summer of 2000, the Chief Judge requested that his employees switch to a less-favorable prescription drug and health insurance plan and that they relinquish longevity pay. In return for this concession, the Chief Judge agreed to seek an enhanced employee pension plan

---

[1] The other courts included in the demonstration project were the 83rd District Court, to the extent it served Crawford County; the 87th District Court, to the extent it served Kalkaska and Otsego counties; the Crawford County Probate Court; the Kalkaska County Probate Court; and the Otsego County Probate Court.

[2] The demonstration project was originally scheduled to last only two years and encompassed six project courts: Barry County, Berrien County, Isabella County, Lake County, Washtenaw County, and the 46th Circuit Court. However, pursuant to Administrative Order No. 1997-12, 456 Mich clxxxi, the project was extended "until further order of the [Supreme] Court." Iron County was added as a seventh demonstration project court in 1999. In 2002, the Legislature enacted MCL 600.401 *et seq.*, which permits a county or judicial circuit to consolidate all or part of its operations subject to the approval of this Court. In January 2003, this Court adopted Administrative Order No. 2003-1, 467 Mich cix, which provides in part that "[s]ubject to approval of the Supreme Court, a plan of concurrent jurisdiction may be adopted by a majority vote of judges of the participating trial courts."

and a new retiree health care plan funded by the counties. The Chief Judge presented his enhanced benefits plan, first, to the Tri-County Committee, a nonbinding committee that consisted of individuals representing each county, and subsequently to each county's board of commissioners. The boards of commissioners for Otsego and Kalkaska counties passed resolutions agreeing to implement the enhanced benefits plan. On August 29, 2000, the Crawford County Board of Commissioners passed the following resolution:

> MOTION by Hanson, seconded by Beardslee, to authorize the County [to] pay 24% of $50,000 ($12,000) for the year 2000 and that payment will increase at 4% per year until 2017, and at that time will pay an estimated $94,649 and that the Blue Cross/Blue Shield medical supplement payment per individual would be capped at [sic] the year 2000 at $4,087.00 [and] would increase at 4% per year until 2017 for an employee to be eligible for $7,654.00 per year.

> MOTION by Wieland, seconded by Hanson, to request the [Trial] Court not implement the MERS [Municipal Employees' Retirement System] B-4 upgrade at this time, but recognize the change in the 2001/2002 budget cycle.

That same afternoon, the Chief Judge informed the Chairwoman of the Crawford board that there had been an error in calculating the annual premium for the first year of the retiree health care plan and that the $4,087 figure was too low. The Chief Judge and the Chairwoman of the board subsequently agreed that the sum of $5,763 should be substituted as the correct first-year premium. However, the Crawford board never amended the resolution to reflect this new figure.

Following the vote in Crawford County, the Chief Judge prepared a contract memorializing the agreement. Although the contract was signed by

4

representatives from Kalkaska and Otsego counties, Crawford County refused to sign the contract because of the board's concern regarding the prospect of a sizeable unfunded liability.[3] Shortly thereafter, on December 4, 2000, the Chief Judge implemented both the enhanced benefits plan and the employee concessions by order. Initially, Crawford County alone refused to appropriate its share of the costs of the enhanced benefits plan for fiscal years 2001-2003. However, approximately one year after the implementation order was entered, the Kalkaska County Board of Commissioners rescinded its resolution approving the enhanced benefits plan primarily on the basis of the concerns raised by Crawford County.[4] Otsego County proceeded to fund the entire cost of the enhanced benefits plan without reimbursement from the other funding units.

After unsuccessful attempts to settle the dispute, the Chief Judge communicated the notice required by Administrative Order No. 1998-5 § III(1), 459 Mich clxxvi, of the Trial Court's intention to sue Crawford County. After the required 30-day waiting period expired, the Trial Court brought this action to compel funding, claiming both that Crawford County was contractually obligated to fund the enhanced benefits and that it had failed to provide sufficient funds to

---

[3] Crawford County Commissioner Scott Hansen also noted that the board rejected the contract because it was "not what [the board] approved [on August 29, 2000.]" Defendant's appendix at 435a.

[4] Kalkaska County paid its full share of the Trial Court's budget in both 2001 and 2002. It failed to appropriate funds for its share of the enhanced benefits plan for fiscal year 2003.

allow the court to operate. Specifically, the Trial Court argued that, absent the enhanced benefits, the morale of its employees would decline, leading to lower productivity and, as a result, the court would be unable to function. The Trial Court further argued that it could not generate sufficient savings in its budget to pay for the enhanced benefits and that any staff cuts would prevent the court from operating at a serviceable level. Crawford County denied the allegations and asserted in a counterclaim that the Trial Court had exceeded its authority when it implemented the enhanced pension and retiree health care plans and that the Trial Court had fraudulently misrepresented the costs of the latter. Kalkaska County moved to intervene on behalf of Crawford County. In a separate action, Crawford and Kalkaska counties sued Otsego County, claiming that Otsego County had improperly implemented the enhanced pension and retiree health care plans and had colluded with the Trial Court to withhold information about the cost of the pension increase. The cases were consolidated and the State Court Administrator assigned a circuit judge from outside the affected counties to preside over these cases.

The circuit judge eventually found that the Trial Court's requested budget, specifically the requested appropriation for the enhanced benefits plan, was "reasonable and necessary" to the court's ability to perform its essential functions. The requested appropriation was "reasonable" because it was not "excessive" and was "comparable to what other courts spend on like activities." The requested appropriation was also "necessary" because it had been "convincingly" proved

6

that loss of the benefits plan would destroy employee morale to the point where the court could no longer function. The circuit judge also found that the August 29, 2000, resolution created an explicit contract with the Trial Court to implement the enhanced benefits plan. In a published opinion, 266 Mich App 150; 702 NW2d 588 (2005), the Court of Appeals affirmed.[5]

This Court granted the defendant counties' application for leave to appeal, limited to the questions: (1) whether the appropriations sought for the enhanced benefits plan were "reasonable and necessary to achieve the court's constitutional and statutory responsibilities"; (2) whether the defendant counties were contractually obligated to fund the enhanced benefits plan at the level requested by the Trial Court; and (3) whether there was evidence to support the conclusion that the level of funding offered by the counties was insufficient to allow the court to fulfill its essential functions. 474 Mich 986 (2005).[6]

---

[5] Judge Zahra, concurring in part and dissenting in part, opined that defendants had a preexisting statutory and constitutional duty to provide the Trial Court with sufficient funding to carry out its constitutional responsibilities. Because of this, the Trial Court's contract claim failed for lack of consideration. In addition, he observed that there was no statutory or other authority underlying the contract claims between courts and their funding units.

[6] In addition to affirming the judgment of the circuit judge on the Trial Court's contractual and "inherent power" claims, the Court of Appeals resolved a number of other issues, including the Trial Court's entitlement to attorney fees. Applications for leave to appeal from those matters have been held in abeyance by this Court for resolution of the instant case. *Crawford Co v Otsego Co*, 707 NW2d 350 (2005); *46th Circuit Trial Court v Crawford Co*, 707 NW2d 351 (2005); *Crawford Co v Otsego Co*, 707 NW2d 351 (2005); *46th Circuit Trial Court v Crawford Co,* 707 NW2d 594 (2005).

## II. STANDARD OF REVIEW

Whether county funding of local court operations satisfies constitutional requirements presents a constitutional question that this Court reviews de novo. *DeRose v DeRose*, 469 Mich 320, 326; 666 NW2d 636 (2003). We review for clear error the factual findings underlying the circuit judge's determination of whether the requested appropriation was "reasonable and necessary." MCR 2.613(C).

Issues of contract interpretation are questions of law that we review de novo. *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002). We review for clear error the findings of fact underlying the circuit judge's determination whether a valid contract was formed. *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). A finding is "clearly erroneous" if, "the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Bynum v EASB Group, Inc*, 467 Mich 280; 285; 651 NW2d 383 (2002). The interpretation of a county resolution, as with the interpretation of a statute, is a question of law, which we review de novo. *Eggleston v Bio-Medical Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003).

## III. ANALYSIS

### A. "INHERENT POWER"

The judiciary's "inherent power" to compel funding is an extraordinary power and is derived from the separation of governmental powers set forth

principally in Const 1963, arts 4-6, relating to the authorities of the legislative, executive, and judicial branches of government, and Const 1963, art 3, § 2, which provides:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

The framers of Michigan's Constitution understood well the importance of separating the powers of government. The doctrine of separation of powers rests on the notion that the accumulation of too much power in one governmental entity presents a threat to liberty. James Madison expressed this sentiment more than 200 years ago when he wrote, "the accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist, No. 47. Thus, governmental power was separated-- with the Legislature exercising the "legislative power," Const 1963, art 4, § 1; the Governor exercising the "executive power," Const 1963, art 5, § 1; and the judiciary exercising the "judicial power," Const 1963, art 6, § 1.

The "legislative power" has been defined as the power "to regulate public concerns, and to make law for the benefit and welfare of the state." Cooley, Treatise on the Constitutional Limitations (Little, Brown & Co, 1886), at 92. Perhaps the most fundamental aspect of the "legislative power," authorized by the opening sentence of US Const, art I, § 8, which defines the powers of the

legislative branch, is the power to tax and to appropriate for specified purposes. See also Const 1963, art 4. The power to tax defines the extent to which economic resources will be apportioned between the people and their government, while the power to appropriate defines the priorities of government. Partly in recognition of the enormity of these powers, the framers of our constitutions determined that the branch of government to exercise these powers should be that branch which is closest to, and most representative of, the people.

This is true for other reasons as well. In contrast with the judiciary, for example, the legislature is not restricted in the range of testimony that it may hear as a prelude to enacting public policy, it is better positioned to accommodate competing policy priorities, it is better equipped to effect compromise positions after negotiation and bargaining, it is more regularly and directly accountable to the people, and its membership is more broadly representative of society and its various interests.

However, just as it is implicit in the separation of powers that each branch of government is empowered to carry out the entirety of its constitutional powers, and only these powers, it is also implicit that each branch must be allowed adequate resources to carry out its powers. Although the allocation of resources through the appropriations and taxing authorities lies at the heart of the *legislative* power, and thus belongs to the legislative branch, in those rare instances in which the legislature's allocation of resources impacts the ability of the judicial branch to carry out its constitutional responsibilities, what is otherwise exclusively a part of

the legislative power becomes, to that extent, a part of the judicial power. As observed by James Madison:

> [M]embers of each department should be as little dependent as possible on those of the others, for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the Legislature in this particular, their independence in every other would be merely nominal. [Madison, The Federalist, No. 51.]

> As the legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all a prevailing influence over the pecuniary rewards of those who will fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former. [Madison, The Federalist, No. 48.]

In order for the judicial branch to carry out its constitutional responsibilities as envisioned by Const 1963, art 3, § 2, the judiciary cannot be totally beholden to legislative determinations regarding its budgets. While the people of this state have the right to appropriations and taxing decisions being made by their elected representatives in the legislative branch, they also have the right to a judiciary that is funded sufficiently to carry out its constitutional responsibilities.

Thus, the judiciary's "inherent power" to compel appropriations sufficient to enable it to carry out its constitutional responsibilities is a function of the separation of powers provided for in the Michigan Constitution. The "inherent power" does not constitute an exception to the separation of powers; rather, it is integral to the separation of powers itself. What *is* exceptional about the judiciary's "inherent power" is its distinctiveness from more traditional exercises

11

of the judicial power, involving as it does determinations that directly implicate the appropriations power.

However, in order to accommodate this distinctive, and extraordinary, judicial power with the normal primacy of the legislative branch in determining levels of appropriations, the "inherent power" has always been sharply circumscribed. The "inherent power" contemplates only the power, when an impasse has arisen between the legislative and judicial branches, to determine levels of appropriation that are "reasonable and necessary" to enable the judiciary to carry out its constitutional responsibilities. However, levels of appropriation that are *optimally* required for the judiciary remain always determinations within the legislative power.

This Court has recognized the inherent powers doctrine for over 120 years. In *Stowell v Jackson Co Bd of Supervisors*, 57 Mich 31; 23 NW 557 (1885), the Jackson Circuit Court deemed it necessary to house jurors in a hotel during the course of a murder trial. After the trial was over, however, the board of supervisors refused to pay for the hotel charges. This Court undertook its analysis by noting that the trial court has the power and discretion to determine whether a jury needs to be secluded. We reasoned that, because the trial court has the power to sequester the jury, it must also have the authority to bind the county funding unit to pay for that sequestration. *Id.* To hold otherwise "would put it in the power of a board of supervisors to prevent courts from exercising their proper

12

functions." *Id.* at 34-35.[7] Therefore, the Court concluded that, while the Legislature controls the power of the purse, "the inherent power and duty of courts to exercise their functions must authorize [payment for actions such as the sequestration] as becomes expedient in the course of judicial business." *Id.* at 34.

That the judiciary's inherent power to compel funding also extends to the appropriation of funds for employee salaries was expressed by Justice Black in his dissenting opinion in *Wayne Circuit Judges v Wayne Co*, 383 Mich 10; 172 NW2d 436 (1969) (*Wayne Co I*). As he explained, the essence of the "inherent power" doctrine is "that the constitutionally-assigned duty of a court such as ours automatically carries with it the power and responsibility of making [continually] sure that this 'one court of justice' (Const 1963, art 6, § 1) functions serviceably as a co-equal branch of Michigan's government . . . ." *Id.* at 33. To determine whether a court can function "serviceably," Justice Black indicated that the Court must first determine whether the appropriation sought by the court is necessary to address a "critical judicial need[]" and, if it is, then determine whether the amount requested is reasonable "to meet the urgency of the situation." *Id.* at 34.

---

[7] Importantly, this Court noted that "[i]t would be very unsafe, and might imperil the validity of a conviction, if the care of the jury should be left to the discretion of an officer." *Id.* at 32-33. In other words, the power to sequester a jury, and the corresponding power to demand payment from the funding authority to pay for that sequestration, plays a vital role in a court's ability to conduct criminal trials and, therefore, to exercise its constitutionally mandated responsibilities.

13

Less than two years later, this Court expressly adopted Justice Black's dissenting statement in *Wayne Co I*. *Wayne Circuit Judges v Wayne Co (On Rehearing)*, 386 Mich 1, 8-9; 190 NW2d 228 (1971) (*Wayne Co II*). In so holding, this Court concluded that

> "the Judiciary *must possess* the inherent power to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice, if it is to be in reality a co-equal, independent Branch of our Government." [*Id.* at 9, quoting *Commonwealth, ex rel Carroll v Tate*, 442 Pa 45, 52; 274 A2d 193 (1971) (emphasis in original).]

We further reasoned that the "inherent powers" doctrine is rooted in the constitutional command that the judicial power of this state is vested exclusively in "one court of justice . . . ." Const 1963, art 6, § 1. "The [L]egislature may not abolish that court. Neither is it permissible for the [L]egislature to render the court inoperative by refusing financial support." *Wayne Co II, supra* at 14 (opinion by T.E. Brennan, J.). Thus, the judiciary has the inherent power to seek the funding necessary to sustain its ability to function serviceably in carrying out its constitutional responsibilities. *Wayne Co I, supra* (Black, J., dissenting). On that basis, this Court held that Wayne County must appropriate funds for those positions "established by the law or needed in the operation of the circuit court . . . ." *Id.* at 33.

Subsequent decisions make clear that the judiciary's inherent power to compel funding is limited to those appropriations required to meet "critical judicial needs." *Wayne Co Prosecutor v Wayne Co Bd of Comm'rs*, 93 Mich App

14

114; 286 NW2d 62 (1979). In *Wayne Co Prosecutor,* several county executive officers sought an injunction against budget cuts proposed by the defendant county. The Court of Appeals began its analysis by noting that, as is the case with the judiciary, a funding authority is obligated to budget sums sufficient to allow executive officers to carry out their mandated duties and obligations. However, the Court of Appeals also recognized that the courts must not involve themselves with the "truly discretionary appropriations decisions of a county board . . . ." *Id.* at 122. To balance these concerns, the Court of Appeals held that

> "serviceability" [is] the standard to be applied in determining whether the board of commissioners has unlawfully underfunded the county executive officers so that they are unable to fulfill their statutory obligations. Serviceability must be defined in the context of Justice Black's opinion, *i.e.* "urgent", "extreme", "critical", and "vital" needs. A serviceable level of funding is the minimum budgetary appropriation at which statutorily mandated functions can be fulfilled. A serviceable level is not met when the failure to fund eliminates the function or creates an emergency immediately threatening the existence of the function. A serviceable level is not the optimal level. A function funded at a serviceable level will be carried out in a barely adequate manner, but it will be carried out. A function funded below a serviceable level, however, will not be fulfilled as required by statute. [*Id.* at 124, citing *Wayne Co I* (Black, J., dissenting).]

This Court reiterated the limited nature of the "inherent power" doctrine in *Employees & Judge of the Second Judicial Dist Court v Hillsdale Co*, 423 Mich 705, 717; 378 NW2d 744 (1985). In *Hillsdale Co*, this Court addressed the issue of whether a funding unit could be compelled to appropriate funds for salary increases that were neither approved by it nor "proven to be necessary to maintain a statutory function of the court or to provide for the overall administration of

justice."[8]  This Court began its analysis by noting that "[e]ach branch of government has inherent power to preserve its constitutional authority."  *Id.*  On the other hand, "an indispensable ingredient of the concept of coequal branches of government is that 'each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches.'"  *Id.,* quoting *United States v Will*, 449 US 200, 228; 101 S Ct 471; 66 L Ed 2d 392 (1980).  Thus, a lawsuit to compel funding under the "inherent powers" doctrine is limited to circumstances where "the overall operation of the court, or a constitutional function is in jeopardy because of the actions taken by the funding unit."  *Hillsdale Co, supra* at 717-719.  This Court noted that there was no dispute that, as found by the trial court, the plaintiff trial court was functioning at a level "'satisfactory to all.'"  *Id.* at 722.  Because there was no claim that the plaintiff trial court could not exercise a statutory or constitutional function, there was no basis to resolve "the issue of when and under what standards the judiciary may compel expenditures beyond those appropriated . . . ."  *Id.* at 722.

Justice Riley wrote separately for the purpose of "set[ting] forth principled procedures to resolve, as fairly and expeditiously as possible, those conflicts which necessarily arise when the legislative branch refuses to approve funding

---

[8] In the companion case, *Cheboygan Co Bd of Comm'rs v Cheboygan Circuit Judge*, the Cheboygan Circuit Court sought to compel funding for a part-time mediation clerk.  However, at issue in *Cheboygan Co* was the question of whether a trial court may employ an administrative order to compel funding in excess of the court's appropriation.  This Court concluded that the use of an administrative order was inappropriate under MCR 8.112(B).

requested by the judicial branch for reasonable and necessary court operations."
*Id.* at 728 (Riley, J., dissenting). Specifically, Justice Riley responded to the majority's failure to articulate a standard against which the court's inherent power to compel funding is to be measured. Justice Riley began her analysis by recognizing that the "inherent powers" doctrine was designed to preserve the balance of power between the three branches, not to upset that balance in favor of judicial supremacy. In order to protect both the county board's power over county funds and the court's ability to exercise the judicial power, Justice Riley concluded that "the judiciary must bear the burden of articulating the constitutional bases for asserting [the inherent power]" and that it must invoke the authority "with caution, in a manner that will not place in jeopardy the public's confidence in the integrity of the judiciary." *Id.* at 740. Specifically, Justice Riley opined that the court seeking to compel funding must "set forth specific findings of fact, identifying those judicial functions that will be in jeopardy if the appropriation requested is denied, and conclusions of law indicating why the function is required by the constitution." *Id.* at 744.

We agree with Justice Riley that invocation of the "inherent power" of the judiciary will least disrupt the constitutional balance between the judicial and legislative branches where procedures of the sort she proposes are followed. Accordingly, we adopt that portion of Justice Riley's opinion that articulates the *procedure* that trial courts must follow in pursuit of their "inherent power."

17

In litigation to compel funding, the plaintiff court must prove by clear and convincing evidence that the requested funding is both "reasonable and necessary." *Branch Co Bd of Comm'rs v Service Employees Int'l Union*, 168 Mich App 340, 351; 423 NW2d 658 (1988); *17th Dist Probate Court v Gladwin Co Bd of Comm'rs,* 155 Mich App 433, 453; 401 NW2d 50 (1986). The plaintiff court seeking to compel funding must demonstrate that "the overall operation of the court, or a constitutional function is in jeopardy because of the actions taken by the funding unit." *Hillsdale Co, supra* at 717-719. Finally, a court deciding an inherent powers claim must specifically set forth findings of fact identifying specifically those judicial functions that will be in jeopardy if the appropriation sought is denied, and conclusions of law indicating why such functions implicate the constitutional responsibilities of the judiciary.

## B. CLEAR & CONVINCING EVIDENCE

Because the Trial Court here has failed to demonstrate by clear and convincing evidence that the enhanced benefits plan is both "reasonable and necessary" to allow that court to function serviceably in carrying out its constitutional responsibilities, we conclude that the circuit judge and the Court of Appeals clearly erred in holding that the Trial Court could compel appropriations for such plan. An appropriation is "necessary" when it is sought by the court to address a "critical judicial need[]" that affects that court's ability to function "serviceably" in carrying out its constitutional responsibilities. *Wayne Co I, supra* at 33-34. A "serviceable" level of funding is "the minimum budgetary

18

appropriation at which statutorily mandated functions can be fulfilled." *Wayne Co Prosecutor, supra* at 124. "A function funded at a serviceable level will be carried out in a barely adequate manner, but it will be carried out." *Id.*

To justify the conclusion that the enhanced benefits plan was both "reasonable and necessary," the circuit judge and the Court of Appeals both relied on the claims of the Chief Judge that failure to provide the enhanced benefits would negatively affect employee morale. However, we believe that the Trial Court failed to demonstrate that there existed a morale problem that impaired the court's ability to function "serviceably" in carrying out its constitutional responsibilities. *Wayne Co II*.

Specifically, the Chief Judge testified that there "probably" would be people who would quit their jobs and that the Trial Court would have trouble finding new employees. However, the Chief Judge's opinion was utterly unsupported. The Trial Court failed to demonstrate that even *one person* had either left its employ or was planning to leave its employ as a result of the alleged inadequacy of the preexisting benefits plan.[9] Further, the Trial Court was unable

---

[9] The dissent argues that the testimony of Rudi Edel, the Trial Court's administrator, that "six [employees] left for wages and benefits" supports the circuit judge's conclusion that the enhanced benefits plan was "reasonable." *Post* at 9. However, when Edel was asked, "How many [of the six employees] told you that the reason they were leaving was for better retirement plans?" he could not identify even one such person. Defendants' appendix at 1468a. Further, one of the Trial Court's judges, Judge Dennis Murphy, testified at a deposition that he had never heard either directly or indirectly of any employee who had quit or
(continued…)

19

to identify even *one person* who had refused an offer of employment because the preexisting benefits plan was inadequate.

Even assuming for the sake of argument that there was sufficient evidence to support the Chief Judge's claim of declining morale, a claimed effect on employee morale, by itself, is not sufficient to invoke the "inherent powers" doctrine. The circuit judge and the Court of Appeals based their holdings on *Gladwin Co*. In *Gladwin Co*, the defendant funding unit determined compensation for court employees without taking into account the training, responsibilities, and duties of each position. As a result, for example, a probation officer was paid the same amount as a register, and a newly hired juvenile probation officer was paid the same wage as the defendant county's general clerical employees. The Court of Appeals concluded that, because of the morale problems caused by this "unfair and inequitable" pay scheme, the additional appropriations for salaries for the disputed positions were "reasonable and necessary." *Id.* at 454-455.

However, we note that declining employee morale alone was *not* the determinative factor in *Gladwin Co.* As noted by the Court of Appeals, the irrational pay scheme instituted by the funding unit had caused the court to fill the position of juvenile probation officer six times in less than 12 years. Further, the court had considerable difficulty attracting competent employees for the position,

---

(…continued)
contemplated quitting their job in the event they did not receive a better pension plan. *Id.* at 1225a.

as demonstrated by the two occasions on which the position had gone unfilled for more than three months each. In other words, the irrational pay scheme had not just caused the court's employees to become "demoralized," but such morale problems had specifically manifested themselves in the court's inability to hire and retain probation officers. Accordingly, we conclude that a claim that court employees suffer from a loss of morale is insufficient to support an inherent powers claim, absent some showing that the claimed morale problems have demonstrably caused court employees to be unable to carry out their constitutional responsibilities.

Further, there is no evidence here that the productivity of court employees has diminished to such an extent that the court cannot carry out its constitutional responsibilities, or indeed that it has diminished to any extent. Rudi Edel, administrator of the Trial Court, testified that the court was not suffering from any speedy-trial problems either before or after the current funding controversy. Defendants' appendix at 1452a-1453a.[10] In fact, the court has continued to process its civil and criminal dockets adequately.[11] *Id.* Moreover, an audit

---

[10] Edel further acknowledged that, with current staffing levels, the Trial Court is "getting our work done, our *mandated and reasonable and necessary functions.*" Plaintiff's appendix at 700b (emphasis supplied).

[11] Edel testified that the Trial Court was not complying with at least one administrative order of this Court, three or four federal statutes, and three or four state statutes. Trial Transcript Vol 1 at 284. According to the dissent, this evidence supports the circuit judge's findings of fact. *Post* at 10. However, there was no evidence to suggest that the Trial Court was fulfilling these requirements

(continued…)

21

conducted by the State Court Administrative Office determined that the Trial Court's quality control is "excellent." Thus, unlike in *Gladwin Co*, there is no evidence that the claimed morale problems rendered the court incapable of carrying out any of its essential judicial functions. Even if we accept the Chief Judge's unsupported statements that some court employees may have "one eye on another job" and will be "unhappy," the Trial Court has failed to demonstrate that those employees are unable to perform their jobs. In fact, the Trial Court's own expert testified that the employees were functioning "within the ranges that are expected to be there by the State." Plaintiff's appendix at 852b.[12] Further, the

---

(…continued)
before the instant controversy. Moreover, the requested appropriation is for *retiree* benefits and would not result in a single additional person being hired. The dissent opines that "people *do* choose jobs on the basis of the adequacy or inadequacy of retiree benefits." *Post* at 11. Doubtless, employees rely on any number of factors in choosing jobs. While retirement benefits undeniably are within a broad range of factors an employee considers in deciding whether to accept an offer of employment, there is no demonstrated impact in this case of the absence of *additional* such benefits upon the Trial Court's ability to fulfill its constitutional and statutory obligations. Accordingly, the appropriation at issue is not "reasonable and necessary" in the sense that the judicial branch can impose this appropriation upon unwilling counties as part of its inherent powers.

[12] The expert, Ross Childs, who is the county executive of Grand Traverse County, testified:

> I looked at the budgets that were prepared. I read some of the documents. I looked at it and made an assessment as to whether there was what I thought "fat" in the budget. I didn't see a lot of fat in the budget. I looked at the caseloads and I went through the State Court Administrator's Officer and looked at the reports that were there, the assignments and the staff and the caseload per staff for caseworkers in the Friend of the Court and probation officers and so

(continued…)

Chief Judge admitted that his staff was "soldiering on" even in light of the potential loss of the enhanced benefits plan. In other words, even assuming that the employees were dissatisfied or unhappy, the Trial Court was, in fact, *able* to function as a court even without the enhanced benefits plan. The question in an inherent powers case is not whether all court employees are "satisfied" or "happy," but, rather, whether they are able to perform their jobs in a manner that allows the Trial Court to function "serviceably" in carrying out its constitutional responsibilities.

Also, the Chief Judge admitted at trial that he specifically asked for "the best [pension] plan that's available." Trial transcript at 342. In other words, the requested appropriation, by its own terms, comprises the *maximum* necessary to improve employee morale, not what was "reasonable and necessary" to ensure that its employees could carry out the Trial Court's constitutional responsibilities.

Finally, any claimed morale problems that did exist among the Trial Court's employees seem predicated upon the Chief Judge's own unilateral promise to provide the enhanced benefits.[13] To this extent, the Trial Court is seeking to

---

(…continued)

> on were consistent; that they are well in -- within the ranges that are expected to be there by the State. I didn't find the fat in the budget. [*Id.*]

[13] The dissent argues that it was the counties' decision to renege on the agreement, and not the Chief Judge's unilateral promises, that created the alleged morale problems. *Post* at 13-15. However, when the Chief Judge implemented the benefits plan by order in December 2000, he did so knowing that Crawford

(continued…)

require the counties to pay for a problem that it has arguably created. It cannot be that a court can claim a "morale problem" where the alleged problem is a function of unwarranted promises of benefit increases that it has made to its employees. Under the circuit judge's reasoning in this regard, any court could seek to invoke its "inherent power" to compel its funding unit to make an appropriation beyond what it was prepared to make-- no matter how unreasonable or unnecessary-- solely on the basis of such a unilateral promise. To adopt such a position would not maintain the balance of powers between the legislative and judicial branches-- as the "inherent powers" doctrine is designed to do-- but would instead impose a doctrine of judicial supremacy in favor of the branch of government *least* suited to make policy-driven appropriations and taxing decisions.[14]

(…continued)
County was unwilling to go along. This was established in a September 29, 2000, letter by the Chief Judge to the county boards of commissioners, which stated that "should the contract fail to be executed prior to the year's end, issues regarding wages and longevity bonuses will have to be revisited." Defendant's appendix at 1695a. This was also established in a November 2000 letter by the Chief Judge to the county boards of commissioners, which recognized that "Crawford County is still considering that matter" and that "we must conclude our arrangement early in the month of December." Defendants' appendix at 414a-415a. Had Crawford County already agreed to the purposed benefits, as the dissent asserts, Crawford County would not have needed to "consider" anything and there would have been no need to "revisit" the wage and longevity pay concessions made by the Trial Court's employees.

[14] Indeed, we note that Kalkaska County's request for an additional one mill of taxation to fund the Trial Court's retirement expenses was overwhelmingly defeated by the voters in that county, with 4,415 votes against the proposal to 568 votes in favor of the proposal. Defendants' appendix at 1371a.

In light of insufficient evidence that the appropriation for enhanced benefits sought by the Trial Court was "necessary" to the ability of the court to function "serviceably" in carrying out its constitutional responsibilities, the Trial Court has failed to establish a right to compel funding from the defendants under the "inherent powers" doctrine.[15] Therefore, any increased benefits for the employees of the Trial Court must come through the ordinary processes of negotiation and bargaining between the Trial Court and the representatives of the people on the Crawford, Kalkaska, and Otsego county boards of commissioners; such benefits are not properly obtained by judicial order.

## C. CONTRACT CLAIMS

Although we conclude that the requested appropriation was not "necessary" to allow the Trial Court to function "serviceably" in carrying out its constitutional responsibilities, we must also address the lower courts' alternative conclusion that defendants are contractually obligated to appropriate funding for the enhanced benefits plan.

Administrative Order No. 1998-5, 459 Mich clxxvi-clxxvii, provides in pertinent part:

> A court must submit its proposed and appropriated annual budget and subsequent modifications to the State Court Administrator at the time of submission to or receipt from the local funding unit or units. The budget submitted must be in conformity

---

[15] Because we conclude that the enhanced benefits were not "necessary," we need not determine whether those benefits were a reasonable means "to meet the urgency of the situation." *Wayne Co I, supra* at 33-34 (Black, J., dissenting).

with a uniform chart of accounts. If the local funding unit requests that a proposed budget be submitted in line-item detail, the chief judge must comply with the request. . . . A chief judge may not enter into a multiple-year commitment concerning any personnel economic issue unless: (1) the funding unit agrees, or (2) the agreement does not exceed the percentage increase or the duration of a multiple-year contract that the funding unit has negotiated for its employees. . . .

* * *

If, after the local funding unit has made its appropriations, a court concludes that the funds provided for its operations by its local funding unit are insufficient to enable the court to properly perform its duties and that legal action is necessary, the procedures set forth in this order must be followed.

Our primary task in construing a statute is to discern and give effect to the intent of the Legislature. *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). "The words of a statute provide 'the most reliable evidence of its intent . . . .'" *Id.*, quoting *United States v Turkette*, 452 US 576, 593; 101 S Ct 2524; 69 L Ed 2d 246 (1981). This Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Sun Valley*, *supra* at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley*, *supra* at 237. "If the language of the statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id.* at 236. "[T]he same principles of statutory construction apply in determining [this Court's] intent in

26

promulgating rules of procedure . . . ." *People v Davis*, 181 Mich App 354, 356; 448 NW2d 842 (1989).

As noted above, the Constitution imposes a duty on a county board of commissioners to appropriate funds "reasonable and necessary" to allow the court to function serviceably in carrying out its constitutional responsibilities. Once the board of commissioners has made a funding determination, AO 1998-5 imposes a duty on the court not to exceed either the total amount appropriated by the board or the amount specified in a line-item appropriation. Where the total or line-item appropriation is insufficient, the court must follow the procedures set forth in AO 1998-5. A trial court may only challenge a funding decision made by a county board if "the funds provided for its operations . . . are insufficient to enable the court to properly perform its duties . . . ." *Id.* Thus, the county board's appropriations to the judiciary can be challenged either through the political process, i.e., by seeking an additional appropriation from the board, or through the legal process, when the board has failed to appropriate enough money to allow the court to function serviceably in carrying out its constitutional responsibilities. However, if it decides not to exercise either of these two options, a trial court must live within the budget appropriated by its board.

The circuit judge and the Court of Appeals majority concluded that a county board could also be bound by contract to appropriate a certain level of funding to its trial courts. However, the county board has a preexisting

constitutional duty to appropriate a serviceable level of funding to its trial courts.

An essential element in a contract claim is legal consideration. *Yerkovich v AAA*, 461 Mich 732, 740; 610 NW2d 542 (2000). "Under the preexisting duty rule, it is well settled that doing what one is legally bound to do is not consideration for a new promise." *Id.* at 740-741. Such a contract would appear to fail for lack of consideration. *Puett v Walker*, 332 Mich 117, 122; 50 NW2d 740 (1952). In other words, because the county board has a preexisting duty to appropriate a serviceable level of funding to its court, a county cannot be compelled under contract law to appropriate "reasonable and necessary" funds to enable the court to function serviceably in carrying out its constitutional responsibilities.

Moreover, there was no "meeting of the minds" between the Trial Court and Crawford County because the terms of the retiree health care plan were altered after the Crawford County resolution was passed. *West Bloomfield Hosp v Certificate of Need Bd (On Remand)*, 223 Mich App 507, 519; 567 NW2d 1 (1997). Here, the resolution passed by Crawford County authorized a $4,087 cap on payments made in the first year of the benefit program. However, the actual first year cap was $5,763. The board never amended the resolution to reflect that new figure, and never voted on any amended resolution. The circuit judge and the Court of Appeals majority held that the resolution constituted a valid acceptance of the Trial Court's offer because "[t]he annual payment cap was not an essential term." 266 Mich App at 160. We disagree. One of the principal concerns raised by Crawford County was that the retiree health care plan would create "massive

28

liabilities [for Crawford County] in the future." Defendants' appendix at 330a. A higher first-year premium would exacerbate these concerns, because the health care plan would potentially have to pay an extra $1,676 for each person covered by the plan in the first year. Obviously, if the fund is required to pay a higher annual premium, the amount of money set aside for the benefit would be depleted faster than anticipated when the board passed its resolution. We conclude that the unambiguous language of the resolution is consistent with the understanding that Crawford County was willing to agree to the plan only if the starting health insurance cost was $4,087 for each employee. Because this figure was not the eventual starting cost of the health insurance, there was simply no meeting of the minds and therefore no contract. Further, no one disputes that the enhanced benefits plan could not have been implemented without the consent of all three funding units. Because the purported contract fails with respect to Crawford County inasmuch as there was no meeting of the minds, any contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.

In summary, a county board's duty to appropriate funds to the judiciary arises from the Constitution. Because a county has a preexisting duty to fund its trial courts, a county cannot enter into a contract with the Trial Court to fund the enhanced benefits plan at a specific level. Moreover, the purported contract fails with respect to Crawford County because there was no meeting of the minds. Because all three funding units had to agree to implement the enhanced benefits

29

plan, any contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.

## IV. CONCLUSION

We conclude that the Michigan Constitution only permits the judicial branch to directly compel the legislative branch to appropriate when a court has not received sufficient funding to operate at a serviceable level. *Hillsdale Co, supra* at 722. A court deciding an "inherent power" claim must set forth findings of fact identifying specifically those judicial functions that will be in jeopardy if the appropriation requested is denied, and conclusions of law indicating why such functions implicate the constitutional responsibilities of the judiciary. We hold that the Trial Court here has failed to demonstrate by clear and convincing evidence that the requested appropriation for enhanced benefits was "reasonable and necessary" to the "serviceability" of the court. The Trial Court has failed to produce any evidence that even one employee was planning to leave if the enhanced benefits were not adopted or that anyone has refused to accept employment with the court because of the preexisting benefits plan. Moreover, the evidence demonstrates that the Trial Court has continued to carry out its essential judicial functions adequately. While the Trial Court may or may not have been functioning "happily" or "optimally," it is nonetheless reasonably functioning, which is all that is required to preclude the exercise of the judiciary's "inherent power."

We also conclude that because a county has a preexisting constitutional duty to fund its courts, the defendant counties could not enter into a contract with the Trial Court to fund the enhanced benefits plan at a specific level. Moreover, the purported contract fails with respect to Crawford County because there was no meeting of the minds. Since all three funding units had to agree to implement the enhanced benefits plan, any contract between the Trial Court and the other funding units for the enhanced benefits plan must also fail.

Accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the circuit judge for entry of judgment in favor of the defendant counties. Increased public employee benefits in defendant counties must be enacted through the democratic processes of government-- through the decision-making of the legislative branch-- not by judicial order.

Stephen J. Markman
Clifford W. Taylor
Robert P. Young, Jr.

31

STATE OF MICHIGAN

SUPREME COURT

46TH CIRCUIT TRIAL COURT,

      Plaintiff, Counter-Defendant,
      Third-Party Plaintiff-Appellee,

v                                       No. 128878

COUNTY OF CRAWFORD AND CRAWFORD
COUNTY BOARD OF COMMISSIONERS,

      Defendants, Counter-Plaintiffs,
      Third-Party Plaintiffs-Appellants,

and

COUNTY OF KALKASKA,

      Intervening Defendant,
      Counter-Plaintiff, Third-Party
      Plaintiff-Appellant

and

COUNTY OF OTSEGO,

      Third-Party Defendant

_____

CORRIGAN, J. (*concurring*).

I concur in the result and virtually all of the reasoning of Justice Markman's lead opinion. In particular, I agree that "the judiciary has the inherent power to seek the funding necessary to sustain its ability to function serviceably in

carrying out its constitutional responsibilities." *Ante* at 14. Further, I agree with the lead opinion that on the facts of this case, the enhanced retirement benefits sought by plaintiff do not fall within the judiciary's inherent authority to compel funding. I do not, however, join the portion of the lead opinion that adopts the reasoning set forth in *Wayne Co Prosecutor v Wayne Co Bd of Comm'rs*, 93 Mich App 114; 286 NW2d 62 (1979).

In general, this Court does not reach constitutional issues that are not necessary to resolve a case. *People v Riley*, 465 Mich 442, 447; 636 NW2d 514 (2001). In my view, the existing authorities *of this Court* fully support the conclusion in Justice Markman's opinion that the enhanced retirement benefits at issue here are not reasonable and necessary to the serviceability of plaintiff's court. See, e.g., *Wayne Circuit Judges v Wayne Co (On Rehearing)*, 386 Mich 1; 190 NW2d 228 (1971) (*Wayne County II*), and other decisions of this Court discussed in the lead opinion.

Therefore, because plaintiff's inherent-powers claim must fail under this Court's own case law, I do not decide whether to adopt the analytic approach set forth by the Court of Appeals in *Wayne Co Prosecutor*. In particular, I do not find it necessary to adopt the assertions in *Wayne Co Prosecutor* that "[a] serviceable level of funding is the *minimum* budgetary appropriation at which statutorily mandated functions can be fulfilled," and that "[a] function funded at a serviceable level will be carried out in *a barely adequate manner*, but it will be carried out." *Wayne Co Prosecutor*, *supra* at 124.

2

In my view, it is simply not necessary in this case to decide whether the judiciary's inherent authority to compel funding should be limited to "minimum budgetary appropriation[s]" and to functions that are carried out "in a barely adequate manner." Rather, I decide this case on the basis of the existing authorities of this Court, which fully support our decision in this case.

For these reasons, I express no view on whether this Court should adopt the analysis outlined in *Wayne Co Prosecutor.* In all other respects, I concur in the analysis and conclusions set forth in Justice Markman's lead opinion.

Maura D. Corrigan

S T A T E   O F   M I C H I G A N

SUPREME COURT

46TH CIRCUIT TRIAL COURT,

      Plaintiff, Counter-Defendant,
      Third-Party Plaintiff-Appellee,

v                                         No. 128878

COUNTY OF CRAWFORD AND CRAWFORD
COUNTY BOARD OF COMMISSIONERS,

      Defendants, Counter-Plaintiffs,
      Third-Party Plaintiffs-Appellants,

and

COUNTY OF KALKASKA,

      Intervening Defendant,
      Counter-Plaintiff, Third-Party
      Plaintiff-Appellant

and

COUNTY OF OTSEGO,

      Third-Party Defendant

_____

WEAVER, J. (*dissenting*).

I respectfully dissent from the result and reasoning of the lead opinion. I would hold that Judge Dennis C. Kolenda, the trial judge who conducted the six day hearing in this case and reviewed the 300 exhibits totaling approximately 5,500 pages, did not clearly err in finding that the enhanced pension plan and the

retiree health care plan were reasonable and necessary to the 46th Circuit Trial Court's ability to perform its mandated responsibilities.

I would affirm the judgment of the Court of Appeals in holding that Judge Kolenda did not clearly err in finding that the requested appropriation to fund the enhanced pension plan and the retiree health care plan was reasonable and necessary.

A

This funding dispute between the 46th Circuit Trial Court (Trial Court) and two of the three counties it serves arose out of the consolidation of certain courts in Kalkaska, Crawford, and Otsego counties, pursuant to Administrative Order No. 1996-9, 451 Mich civ.

During the early stages of unification, the Trial Court concluded that all employees doing the same job, regardless of the county in which they physically worked, should earn equal pay and receive equal benefits. After negotiations with Chief Judge Alton Davis of the Trial Court, the employees agreed to phase out longevity pay and dedicate a portion of all future wage increases to fund the retiree benefits package. The court employees also agreed to accept a cost-saving health care insurance plan that offered less coverage and had a higher prescription copay. Chief Judge Davis then secured the agreement of the three counties, Crawford, Kalkaska, and Otsego, to fund an enhanced pension plan and a retiree health care plan.

2

After Judge Davis entered an order implementing those new plans, Crawford and Kalkaska counties reneged on their agreement and passed resolutions disapproving those plans. Thus, at the time that Judge Davis entered the implementation order that gave the employees their new benefits, he was acting according to the existing approval of the counties. After lengthy negotiations failed, this suit followed.

As a coequal, independent branch of the government, the judiciary has the inherent power "'to determine and compel payment of those sums of money which are reasonable and necessary to carry out its mandated responsibilities, and its powers and duties to administer Justice. . . .'"[1] When a court and funding unit cannot reach agreement, the court may initiate suit to compel expenditures in excess of appropriations.[2]

The question before us is whether the enhanced pension plan and the retiree health care plan are reasonable and necessary for the Trial Court to carry out its mandated responsibilities, and its powers and duties to administer justice.[3]

The lead opinion attempts to limit the judiciary's inherent power to compel funding by adopting the Court of Appeals reasoning in *Wayne Co Prosecutor v*

_____

[1] *Wayne Circuit Judges v Wayne Co (On Rehearing)*, 386 Mich 1, 9; 190 NW2d 228 (1971) (citation omitted).

[2] *Employees & Judge of the Second Judicial Dist Court v Hillsdale Co*, 423 Mich 705, 716; 378 NW2d 744 (1985).

[3] *Wayne Circuit Judges v Wayne Co (On Rehearing), supra* at 9.

*Wayne Co Bd of Comm'rs*,[4] that "[a] serviceable level of funding is the *minimum* budgetary appropriation at which statutorily mandated functions can be fulfilled," and that "[a] function funded at a serviceable level will be carried out in *a barely adequate manner*, but it will be carried out." But Justice Corrigan writes separately to say that "it is simply not necessary in this case to decide whether [to adopt the *Wayne Co Prosecutor* standard]."[5] An opinion of this Court that does not obtain four signatures is not binding precedent.[6] Consequently, the lead opinion does not change the existing standards used to determine whether a court can use its inherent power to secure funding.

## B

This Court reviews the factual findings underlying the trial court's determination whether a requested appropriation was "reasonable and necessary" for clear error.[7] "An appellate court should not reverse the findings of a trial court in such a case unless its findings are clearly erroneous. 'A finding is "clearly erroneous" [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

---

[4] *Wayne Co Prosecutor v Wayne Co Bd of Comm'rs,* 93 Mich App 114, 124; 286 NW2d 62 (1979) (emphasis added).

[5] *Ante* at 3.

[6] *People v Jackson,* 390 Mich 621, 627; 212 NW2d 918 (1973).

[7] *Herald Co v Eastern Michigan Univ Bd of Regents*, 475 Mich __; __ NW2d __ (Docket No. 128263, decided July 19, 2006). *Morris v Clawson Tank Co*, 459 Mich 256; 587 NW2d 253 (1998).

made.'"[8]  The fact-finder has not clearly erred "simply because [the appellate court is] convinced that it would have decided the case differently."[9]  If there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.[10]  Further, assessment of credibility lies within the trial court's province.[11]  Under MCR 2.613(C), "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it."[12]

Although the lead opinion purports to review Judge Kolenda's factual findings for clear error, it in fact engages in a review de novo.  The lead opinion does not give due deference to Judge Kolenda's ability to assess the credibility of the witnesses before him, and imposes its own inaccurate interpretation of the record to conclude that the enhanced pension plan and the retiree health care plan were not reasonable and necessary.

In his 53-page opinion, Judge Kolenda specifically found that the "Trial Courts witnesses [were] credible and persuasive" and the defendant's witnesses

---

[8] *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989) (citation omitted).

[9] *Anderson v Bessemer City*, 470 US 564, 573; 105 S Ct 1504; 84 L Ed 2d 518 (1985).

[10] *Id.* at 574.

[11] *Id.*

[12] *Morris, supra* at 275.

were "ignorant of many pertinent facts"; Judge Kolenda also found that the defendant's witnesses' answers were "shallow," "evasive," and "conclusive." Judge Kolenda stated:

> This Court found the Trial Court's witnesses to be credible and persuasive. They gave testimony which reflected careful and thoughtful assessments of the pertinent facts. Crawford County's expert was a witness who rationalized a pre-ordained opinion. He was ignorant of many pertinent facts and his assessments were shallow. Furthermore, much of his testimony was evasive, betraying a realization that he could not sustain his conclusions. Crawford County's controller was not dishonest, but he could not articulate any persuasive bases for the conclusory positions he took. The several county commissioners who testified were not helpful. They testified only to what they have convinced themselves, or have been convinced, happened and was intended.[13]

Judge Kolenda's candid assessment of the credibility of the witnesses must provide guidance to this Court's review of his factual findings.

C

Judge Kolenda first found that the enhanced pension plan and the retiree health care plan are *necessary*. As Justice Riley stated in her dissent in *Hillsdale, supra*, "to be reasonable and necessary the need must not only be practical rather than relative, but it must be shown that the funds are needed for the effective administration of justice."[14] Judge Kolenda's ultimate finding on the issue of necessity was that

---

[13] Unpublished opinion of the Trial Court for the 46th Judicial Circuit, issued July 25, 2003 (Docket Nos. 02-05951-CZ and 02-10014-CZ), p 4 n 4 (hereafter Trial Court opinion).

[14] *Supra* at 744 (Riley, J., dissenting).

6

[t]his Court is also convinced that funding the proposed retiree healthcare and upgraded pensions are indispensable to the Trial Court continuing to function at a serviceable level. Without those benefit enhancements, staff morale, which is already low, will plummet, with the result that *productivity will suffer badly, soon falling below serviceable levels.* In addition, good employees will leave, and competent replacements will not be found. Those prospects establish that the benefits which the Trial Court seeks to fund are indispensable to maintaining a workforce which is itself indispensable to the Trial Court fulfilling its obligations, making those benefits themselves indispensable. The prospect is enough. The Trial Court need not wait for its operations to actually fall below serviceable levels. [*Seventeenth Dist Probate Court v*] *Gladwin County* [*Bd of Comm'rs,* 155 Mich App 433, 449; 401 NW2d 50 (1986)]. [Emphasis added.][15]

Judge Kolenda's ultimate finding that the enhanced pension plan and the retiree health care plan are necessary was based in part on Judge Kolenda's factual determination that employees were quitting work while waiting for the new benefit package:

Some employees have left out of dissatisfaction with the delay in finalizing the healthcare fund and pension upgrade, but many have stayed in anticipation of getting those benefits. However, if not awarded them, many employees are expected to leave. Moral [sic] will be affected even more; and the judges' ability to lead the Court will be destroyed. The ultimate effect would, obviously, be a serious loss of productivity.[16]

The lead opinion asserts that the proposed benefits are not necessary because the "Trial Court has utterly failed" to demonstrate the necessity:

[T]he Chief Judge testified that there "probably" would be people who would quit their jobs and that the Trial Court would

---

[15] Trial Court opinion, *supra* at 45.

[16] *Id.* at 18.

7

have trouble finding new employees. However, the Chief Judge's opinion was utterly unsupported. The Trial Court failed to demonstrate that even *one person* had either left its employ or was planning to leave its employ as a result of the alleged inadequacy of the preexisting benefits plan.[17]

This statement mischaracterizes the record. Rudi Edel, the trial court administrator and magistrate for the 46th Circuit Trial Court, testified that six employees left for wages and benefits:

[W]e had a turnover rate in the court . . . 36 employees, and by now I think it's around 46/47 employees. Some of those—three or four or five . . . were discharged. Some of those employees left the court as a result of moving out of the area. Some of those employees left the court because they were dissatisfied with wages, benefits. And some of them even with court reform; they were not happy with a shift in their job duties. . . . Another component is that we wanted to attract employees to our court, and to do that we need to have a good benefit structure.[18]

Rudi Edel later quantified the exact number of employees who recently quit because of poor wages and benefits. "Out of the 36 people identified on this list, I can definitely identify that six left for wages and benefits."[19]

In *Gladwin Co*[20] the Court of Appeals held that enhanced pay for a position is "reasonable and necessary" for a court to carry out its assigned functions where

---

[17] *Ante* at 19.

[18] Bench trial volume I, p 132.

[19] Bench trial volume I, p 283.

[20] *Seventeenth Dist Probate Court v Gladwin Co Bd of Comm'rs*, 155 Mich App 433; 401 NW2d 50 (1986).

there was testimony that the court employees had protested the present rate of compensation in writing and orally, that the present rate of compensation had created a morale problem in the court, and the plaintiff's expert witness testified that the current compensation structure was not rational.[21] The lead opinion attempts to distinguish *Gladwin Co,* stating that

> employee morale alone was not the determinative factor in *Gladwin Co*. As noted by the Court of Appeals, the irrational pay scheme instituted by the funding unit had caused the court to fill the position of juvenile probation officer six times in less than 12 years.[22]

This attempted distinction between the facts of *Gladwin Co* and the present case fails. In *Gladwin Co*, the plaintiff went through six juvenile probation officers in less than 12 years. Here, Judge Kolenda noted in his opinion that "[s]ome employees have left out of dissatisfaction with the delay in finalizing the healthcare fund and pension upgrade,"[23] and Rudi Edel testified that "six [employees] left for wages and benefits."

Benefit packages are necessary when at least six frustrated employees quit work because of poor wages and benefits at a court already staffed at bare bones and just getting by. Here, as in *Gladwin Co*, something more than morale establishes that the additional funding is necessary. In both cases, six employees had quit their jobs.

---

[21] *Id.* at 455.

[22] *Ante* at 20 (emphasis omitted).

[23] Trial Court opinion, *supra* at 18.

9

The lead opinion also attempts to refute Judge Kolenda's finding of necessity by stating that "there is no evidence that the employees' productivity has diminished . . . to any extent":

> [T]here is *no evidence* here that the productivity of court employees has diminished to such an extent that the court cannot carry out its constitutional responsibilities *or indeed that it has diminished to any extent*. Rudi Edel, administrator of the Trial Court, testified that the court was not suffering from any speedy-trial problems either before or after the current funding controversy. [24]

Again, the lead opinion's conclusion ignores evidence adduced at trial to support Judge Kolenda's factual findings. Judge Kolenda found that without the benefit enhancements, "productivity will suffer badly, soon falling below serviceable levels." This was supported by testimony that the Trial Court cannot comply with its statutory and court-ordered requirements at the current staffing level. Rudi Edel stated that the court was not complying with at least one administrative order of this Court, three or four federal statutes, and three or four state statutes:

> I found that with our current staffing levels we are complying with all the requirements with very few exceptions. And I would need to see the report to specifically outline those exceptions. I know one is administrative order 1991-4. There is [sic] three or four federal statutes that our Friend of the Court does not comply with; three or four state statues. And these are issues that we just don't have the manpower to get to.[25]

Furthermore, the testimony of Rudi Edel establishes that the court workers are currently working "110 percent." He testified that "[i]f nobody goes on vacation

---

[24] *Ante* at 21 (emphasis added).

[25] Bench trial volume I, p 284.

10

and if nobody gets sick with our current staffing level, once we replace the assignment clerk, we'll get the job done."[26]

The lead opinion asserts that the enhanced benefits were not reasonable and necessary to address the Trial Court's failure to comply with its court-imposed and statutory requirements because the "requested appropriation is for *retiree* benefits and would not result in a single additional person being hired."[27]  Under the lead opinion's rationale, retiree benefits will never be "necessary."  But retiree benefits are part of a comprehensive compensation package; contrary to the lead opinion's contention, people *do* choose jobs on the basis of adequacy or inadequacy of retiree benefits.

The lead opinion also quotes from the testimony of expert witness Ross Childs, the county executive of Grand Traverse County, to support its contention that the Trial Court was "not suffering from any speedy-trial problems. . . ."[28]  The lead opinion states:

> In fact, the Trial Court's own expert testified that the employees were functioning "within the ranges that are expected to be there by the State."[29]

---

[26] Bench trial volume I, p 121.

[27] *Ante* at 22 n 11 (emphasis in original).

[28] *Ante* at 21.

[29] *Ante* at 22.

11

But this quote takes Mr. Childs's testimony out of context. Ross Childs's statement was made in the context of excess budgets.[30] Mr. Childs actually said that the Trial Court's *budget* is "within the ranges that are expected to be there by the State."[31] Mr. Childs's *full* statement was:

> *I looked at the—the budgets that were prepared. I read some of the documents. I—I looked at it and made an assessment as to whether there was what I thought "fat" in the budget. I didn't see a lot of fat in the budget.* I looked at the caseloads and I went through the State Court Administrator's Officer and looked at the reports that were there, the assignments and the staff and the caseload per staff for caseworkers in the Friend of the Court and probation officers and so on were consistent; that they are well in—within the ranges that are expected to be there by the State. *I didn't find the fat in the budget.*[32]

Mr. Childs's statement had nothing to do with the ability of the employees to perform their jobs. The statement was in the context of "fat" within the Trial Court's budget. The lead opinion's statement that the "Trial Court's own expert testified that the employees were functioning 'within the ranges that are expected to be there by the State'" is a mischaracterization.

To summarize, evidence presented at trial demonstrates that the friend of the court cannot meet all of its duties mandated by court administrative order and state and federal statutes. Furthermore, the rest of the court's work can only be performed if the employees work at "110 percent" and no one goes on vacation or

---

[30] Bench trial volume II, p 485.

[31] *Id.*

[32] Bench trial volume II, pp 484-485 (emphasis added).

12

gets sick. As previously stated, clear error exists only when the appellate court "'is left with the definite and firm conviction that a mistake has been made.'"[33]  The lead opinion has not provided a factual basis to justify its "definite and firm conviction that a mistake has been made" because there is evidence on the record to support Judge Kolenda's factual finding that the Trial Court cannot comply with its statutory requirements because of its shortage of manpower.

Finally, the lead opinion asserts that the Trial Court *created* the morale problem:

> [A]ny claimed morale problems that did exist among the Trial Court's employees seem predicated upon the Chief Judge's own unilateral promise to provide the enhanced benefits. To this extent, the Trial Court is seeking to require the counties to pay for a problem that it has arguably created.[34]

The lead opinion misstates the facts.  Judge Davis did not make a unilateral promise to provide enhanced benefits, nor did he create the morale problem.

Judge Kolenda specifically found that on December 4, 2000, Chief Judge Davis "issued an implementation order which recited that '[e]ach of the Funding Units has passed resolutions accepting the benefit shifts which are governed by this order.'"[35]  One week later, the Kalkaska board rescinded its approval of the

---

[33] *In re Miller, supra* at 337 (citation omitted).

[34] *Ante* at 23-24.

[35] Trial Court opinion, *supra* at 16.

13

retiree health care fund and the pension upgrade; then on February 1, 2001, the Crawford board also rescinded its acceptance of the health care fund for retirees.[36]

Thus, at the time that Judge Davis entered the implementation order that gave the employees their new benefits, he was acting according to the existing approval of the counties. The morale problem was created when the counties reconsidered their decision to adopt the retiree health care and pension benefits.

There was testimony offered to establish that Judge Davis did not make a unilateral promise of benefits. Linda Franklin, the probate register in Crawford County, explained how Judge Davis informed the employees of the proposed benefit package. She describes the process as a "*proposed*" exchange of "certain substantial benefits" for "better benefits." At no time did Linda Franklin state that the enhanced benefits were "promised" to her or the other employees:

> Judge Davis called a staff meeting for the court employees in all three counties, I believe in the summer of 2000. *At that meeting he explained to the employees what he was going to propose as far as standardizing and increasing the benefits for the three county court employees.*
>
> In return he requested that we give up certain substantial benefits that we had as a contribution to obtaining those better benefits for all of us.
>
> He asked us to give up our longevity payments. He asked us to give up a certain percentage of our wage increases over a three-year period. And he asked us to accept a different health plan that would gave a higher co-pay for prescription drugs and doctor visits, I believe.

* * *

---

[36] *Id.* at 17.

14

The Court's employees, I believe, were excited *and we wanted to do what we could to try to obtain these better benefits,* and so we all assented at that meeting that we would be willing to give up those substantial benefits if he were able to increase our benefits to these higher levels.[37]

This evidence refutes the lead opinion's theory that Chief Judge Davis created the morale problem by making a unilateral promise to provide enhanced benefits.

D

Judge Kolenda found that the benefits are *reasonable* because they were modest, not excessive, the product of sound judgment, and available to other employees in the counties.[38]

First, Judge Kolenda found the retiree health care benefit was reasonable because it was "capped at a modest annual sum," stating:

The counties are not being asked to provide healthcare benefits to court employees. That could be expensive, although, given the need for healthcare coverage, what fair compensation might require, but the counties are being asked only to make modest, defined annual contributions to a fund from which the Court will buy whatever benefits can be acquired with the assets in that fund. The counties have no exposure beyond the annual contribution, which, even as it escalates, is capped at a modest annual sum.[39]

---

[37] Bench trial volume II, pp 533-534 (emphasis added).

[38] The majority does not address whether the benefits were reasonable. *Ante* at 25 n 15.

[39] Trial Court opinion, *supra* at 48.

15

Second, Judge Kolenda found that the amount requested for the benefits package was "reasonable" because the benefits were not excessive, and the product of sound judgment, stating:

> In sum, a proposed appropriation is reasonable, even though considerably more than what a funding unit is willing to provide, if it is not excessive, e.g., is comparable to what other courts spend on like activities; if it is within the funding unit's ability to pay; and if it reflects sound judgment, e.g., is the product of careful analysis and thought. The budget which the Trial Court proposes in these cases meets those tests. Therefore, that court is entitled to have that budget fully funded.[40]

Third, Judge Kolenda determined that the pension plan is reasonable because it is available to some other employees in Crawford and Kalkaska counties, as well as some employees in nearby counties.[41]

Finally, Judge Kolenda found that the enhanced pension was "not excessive" even though it is the "top of the line" pension available through the state pension system. The lead opinion disagrees with this finding, and contends that the benefits are not reasonable and necessary because the requested appropriation is the "maximum" necessary to improve employee morale, asserting:

> Also, the Chief Judge admitted at trial that he specifically asked for "the best [pension] plan that's available." Trial transcript at 342. In other words, the requested appropriation, by its own terms, comprises the *maximum* necessary to improve employee morale, not what was "reasonable and necessary" to ensure that its

---

[40] *Id.* at 47.

[41] *Id.*

employees could carry out the Trial Court's constitutional responsibilities.[42]

The statement that the requested appropriation is the "maximum necessary to improve employee morale" is taken out of context. At trial, Judge Davis testified:

> [U]nder the [old benefit package], you offer to pay a pension benefit to somebody that either is not sufficient or is barely sufficient to pay . . . [for] the group health care plan once they retire.
>
> So 20 years of service, [and] out the door they go. . . . [Their health care costs] just [eat] up every nickel of [their pension]. And what are you living on? Social Security or your savings or maybe you get another job.[43]

With this pension deficit in mind, Judge Davis made the following statements regarding the "maximum" pension:

> So the time has come . . . to recognize that these people have done what's been asked of them and I feel for a variety of reasons that we have . . . two glaring deficits in our overall structure.
>
> Number one, we have not a good pension circumstance with the MERS [Municipal Employees' Retirement System] pensions that are afforded to . . . court people. Plus they are different county to county and I want unification. . . [T]hat's our goal. And so what I want from you is the best MERS plan that's available . . .
>
> The second thing that is a glaring problem . . . is there's no provision for these people when they leave work for any kind of healthcare. They're just on their own. . . . It's a problem in attracting people. It is a double-edged sword in that respect: In all the time I've been involved in county government, I've seen circumstances where people . . . who should go because they are tired, they're worn out, they're sick . . .; [but] they don't go because this is the only place

---

[42] *Ante* at 23.

[43] Bench trial volume II, p 346.

they can get their medical benefits. . . . So I want some kind of medical retirement plan for these people.[44]

Judge Davis was asserting that the "maximum" pension is reasonable because the larger pension keeps the retirees from having to dip into their life savings or take a second job to pay for their living expenses.

The lead opinion would establish as a rule of law that the "maximum" benefit out of those available to a court could *never* be considered reasonable and necessary. But Judge Kolenda found that the "maximum" pension was both necessary and reasonable under these specific circumstances, stating:

> The proposed pension upgrade is also not excessive. That it is the "top of the line" pension available through MERS does not mean that it is extravagant. First of all, being more generous than other pensions does not mean extravagant. It simply means more than something which is less. . . .
>
> * * *
>
> Further buttressing the conclusion that the B-4 pension is not excessive is the fact that it is part of the benefit package which the Trial Court must provide in order to retain its employees and compete for qualified replacements. What is needed to be competitive cannot possibly be deemed excessive, even if somewhat generous.[45]

Under *In re Miller,*[46] clear error exists only when the appellate court "'is left with the definite and firm conviction that a mistake has been made.'" Review

---

[44] *Id.* at 342-343.

[45] Trial Court opinion, *supra* at 48. As stated above, Judge Kolenda also found that the benefits are reasonable because they were modest, not excessive, the product of sound judgment, and available to other employees in the counties.

[46] *In re Miller, supra* at 337 (citation omitted).

18

of the record does not show that Judge Kolenda clearly erred in finding that the enhanced pension plan and the retiree health care plan are reasonable.

CONCLUSION

As Judge Kolenda noted, the evidence in this case consists of six days of hearings, 14 witness testimonials, and 5,500 pages of exhibits. Judge Kolenda "read and carefully considered" all of the evidence before he held that the employee benefits were both reasonable and necessary. The lead opinion has failed to justify its "definite and firm conviction that a mistake has been made." Without the facts necessary to establish a "definite and firm conviction," the judgments of Judge Kolenda and the Court of Appeals should be upheld. The fact-finder has not clearly erred simply because the appellate court is convinced that it would have decided the case differently.[47]

> Elizabeth A. Weaver
> Michael F. Cavanagh
> Marilyn Kelly

---

[47] *Anderson*, *supra* at 573.

19